# United States Court of Appeals

*for the*

# Fourth Circuit

STEVE KOVACHEVICH, on behalf of himself and all similarly situated individuals,

*Plaintiff-Appellant,*

– v. –

NATIONAL MORTGAGE INSURANCE CORPORATION,

*Defendant-Appellee,*

– and –

LOANCARE, LLC,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## OPENING BRIEF OF APPELLANT

KRISTI C. KELLY
MATTHEW ROSENDAHL
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virgina 22030
(703) 424-7570

*Attorney for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2071                Caption: Steve Kovachevich v. National Mortgage Insurance Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Steve Kovachevich
(name of party/amicus)

who is Plaintiff-Appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?
   __ YES  X NO

2. Does party/amicus have any parent corporations?  ___ YES  X NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ___ YES  X NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
      ___ YES  X̲ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amicus curiae do not complete this question)
      ___ YES  X̲ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ___ YES  X̲ NO
      If yes, identify any trustee and the members of any creditors' committee:

7.    Is this a criminal case in which there was an organizational victim?
      ___ YES  X̲ NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: */s/ Kristi C. Kelly*   Date:  January 19, 2024

Counsel for: Plaintiff-Appellant

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE..................................................................5

    A.    History and Structure of the HPA .......................................5

    B.    Kovachevich's PMI Cancellation.........................................8

    C.    Procedural History...............................................................11

    D.    The District Court's Opinion...............................................12

SUMMARY OF ARGUMENT ...............................................................13

ARGUMENT ...........................................................................................16

    A.    Standard of Review .............................................................16

    B.    The District Court Erred in Interpreting § 4902(f)(2) as Requiring Reimbursement of Unearned Premiums Only for Qualifying Cancellation or Termination Events under § 4902 ..........17

        1.    Section 4902(f)(2) required NMIC to reimburse premiums for termination/cancellation under any provision of the HPA .................................................17

        2.    Section 4902(f)(2) required NMIC to reimburse unearned premiums for voluntary cancellations under § 4910(b) ...............................................................21

        3.    The district court misread the "accordance with paragraph (1)" clause in § 4902(f)(2) as limiting insurers' reimbursement obligations to the same extent as servicers' obligations under § 4902(f)(1) ..............28

CONCLUSION ........................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bailey v. United States Department of Agriculture*,
    59 F.3d 141 (10th Cir. 1995) ........................................................................23

*Barnhart v. Thomas*,
    540 U.S. 20 (2003)........................................................................................30

*Bechtel Constr., Inc. v. United Broth'd of Carpenters*,
    812 F.2d 1220 (9th Cir. 1987) ....................................................................27

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................16

*Broughman v. Carver*,
    624 F.3d 670 (4th Cir. 2010) ......................................................................16

*DaVita Inc. v. Va. Mason Mem. Hospt.*,
    981 F.3d 679 (9th Cir. 2020) ......................................................................30

*Dorsey v. Bowen*,
    828 F.2d 246 (4th Cir. 1987) ......................................................................24

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ......................................................................16

*Erickson v. Pardus*,
    551 U.S. 89 (2007)......................................................................................16

*Fried v. JPMorgan Chase & Co.*,
    No. 15-cv-2512, 2017 WL 5951585 n.2 (D.N.J. Nov. 30, 2017) ...............25

*Gundy v. United States*,
    139 S. Ct. 2116 (2019)........................................................................ 17, 24

*Harrison v. PPG Industries, Inc.*,
    446 U.S. 578 (1980)............................................................................ 20, 21

*LeCompte v. Mr. Chip, Inc.*,
    528 F.2d 601 (5th Cir. 1976) ........................................................................4

*Loughrin v. United States*,
573 U.S. 351 (2014)........................................................ 18, 24, 29

*Minor v. Bostwick Lab'ies, Inc.*,
669 F.3d 428 (4th Cir. 2012) ........................................24

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)........................................................24

*Russello v. United States*,
464 U.S. 16 (1983)..........................................................19

*Ryan v. Edwards*,
592 F.2d 756 (4th Cir. 1979) ........................................24

*Scott v. United States*,
328 F.3d 132 (4th Cir. 2003) ........................................16

*Sidwell v. Express Container Servs., Inc.*,
71 F.3d 1134 (4th Cir. 1995) ........................................24

*Staron v. McDonald's Corp.*,
51 F.3d 353 (2d Cir. 1995) ...................................... 22, 23

*Tcherepnin v. Knight*,
389 U.S. 332 (1967)................................................. 17, 24

*Teamsters Joint Council No. 83 v. Centra, Inc.*,
947 F.2d 115 (4th Cir. 1991) ........................................24

*United States v. Jones*,
60 F.4th 230 (4th Cir. 2023) ................................ 18, 19, 21

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)................................................. 14, 20

*Va. Dep't of Educ. v. Riley*,
106 F.3d 559 (4th Cir. 1997) ........................................24

**Statutes & Other Authorities:**

12 U.S.C. § 4901 ................................................................ 4, 6, 19

12 U.S.C. § 4902.............................................................. *passim*

12 U.S.C. § 4902(f)(1) ...................................................... *passim*

12 U.S.C. § 4902(f)(2) ...................................................................... *passim*

12 U.S.C. § 4903(a)(3) ...........................................................19

12 U.S.C. § 4903(b) ...............................................................19

12 U.S.C. § 4903(d) ...............................................................19

12 U.S.C. § 4906 ....................................................................19

12 U.S.C. § 4908 ....................................................................19

12 U.S.C. § 4909 ....................................................................19

12 U.S.C. § 4904(a) ...............................................................20

12 U.S.C. § 4907 ............................................................... 12, 20

12 U.S.C. § 4907(a) .................................................................8

12 U.S.C. § 4910 ............................................................... 19, 27

12 U.S.C. § 4910(b) ........................................................ *passim*

28 U.S.C. § 1291 ......................................................................4

28 U.S.C. § 1331 ......................................................................4

28 U.S.C. § 1367 ................................................................. 4, 11

42 U.S.C. § 12201(b) .............................................................23

Federal Rule of Civil Procedure 12(b)(6) .................................4

144 Cong. Rec. H5428-02, 1998 WL 391227 ......................25

144 Cong. Rec. S8514-03 .......................................... 5, 6, 8, 25

H.R. Rep. No. 105-55 ............................................................ 6, 25

# INTRODUCTION

Congress passed the Homeowners Protection Act ("HPA" or "Act") in 1998 to address the increasing burden placed on low- and middle-income homeowners by private mortgage insurance ("PMI"). At the time, and still today, mortgage lenders required borrowers who were unable to put down sufficient equity to obtain PMI. Borrowers were, and still are, required to pay monthly premiums on PMI policies, even when the balance of the loan relative to the home's value decreases to the point that PMI is no longer necessary. Neither mortgage holders—who received the security of PMI even when it was no longer required—nor mortgage insurers—who received the windfall of "risk-free" premiums—had an incentive to cancel the PMI or to inform borrowers of their right to do so. This resulted in what Congress described as an "unjustified windfall" to mortgage insurers of over $300 million a year (in 1990s dollars) in unearned premiums. Congress passed the HPA to stop this "fleecing" of U.S. homeowners by requiring mortgage servicers to disclose a borrower's right to cancel or terminate PMI and to require servicers and insurers to reimburse unearned premiums to the borrower.

This appeal concerns the scope of mortgage insurers' obligation to reimburse unearned premiums under the HPA when all parties to the mortgage agree that it is no longer necessary. As alleged below, Appellant Steve Kovachevich was required to obtain PMI for the mortgage on his home. He opted to prepay the premiums,

which his servicer sent to Appellee National Mortgage Insurance Corporation ("NMIC") in one lump sum. As housing prices increased in recent years and he made improvements to his home, however, Kovachevich's increased equity rendered the PMI unnecessary. Kovachevich, the servicer of his mortgage, LoanCare, and the mortgage holder, Freddie Mac, therefore all agreed to cancel the PMI on his loan. But NMIC refused to refund the portion of Kovachevich's prepaid premiums that it had not earned and was keeping as risk-free profit.

Faced with NMIC's refusal to return what it had not earned, Kovachevich asserted a claim against NMIC on behalf of himself and a putative class of similarly situated consumers under the HPA. Kovachevich alleged that NMIC violated § 4902(f)(2) of the Act, which requires mortgage insurers to transfer unearned premiums to the mortgage servicer for repayment to the mortgagor upon any cancellation or termination of PMI "under this chapter." NMIC moved to dismiss this claim, arguing that Kovachevich's cancellation was a voluntary cancellation outside the purview of the Act. The district court agreed, finding that § 4902(f)(2) required NMIC to reimburse unearned premiums only when PMI is cancelled or terminated pursuant to the terms of § 4902, which it found was not satisfied here.

The district court's dismissal of Kovachevich's HPA claim was in error. The district court improperly limited the cancellation and termination events that trigger an insurer's obligation to reimburse unearned premiums to only the provisions of §

4902, even though § 4902(f)(2) requires reimbursement for any cancellation or termination of PMI "under this chapter." By its plain terms, "under this chapter" refers to the *entire Act* and thus triggers an insurer's obligation to reimburse unearned premiums for cancellation or termination of PMI pursuant to any provision of the HPA. Section 4910(b) is one such provision, allowing mortgagors and mortgage holders to agree to cancel or terminate PMI at any time. As alleged below, Kovachevich and his mortgage holder agreed to cancel the PMI on his loan, thus triggering NMIC's duty to reimburse the unearned premiums.

The district court erred in holding otherwise. Not only does its interpretation read "under this chapter" out of § 4902(f)(2), but it also undermines the remedial purpose of the HPA to prevent unjustified windfalls to mortgage insurers. Worse still, it unnecessarily punishes borrowers like Kovachevich who prepay their premiums and can cancel the PMI on their loan earlier than expected. On the other hand, requiring mortgage insurers to reimburse unearned premiums in the broadest possible set of circumstances contemplated by the HPA, including voluntary cancellation under § 4910(b), gives effect to the term "under this chapter" in subsection (f)(2) and is consistent with the Act's remedial purpose. The district court's dismissal of Kovachevich's HPA claim should be reversed.

## JURISDICTIONAL STATEMENT

On November 7, 2022, Kovachevich filed a civil case in the United States District Court for the Eastern District of Virginia asserting claims under the Homeowners Protection Act, 12 U.S.C. § 4901, *et seq.*, and, in the alternative, state common law, over which the district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. JA3. Kovachevich filed an amended complaint asserting the same claims on February 3, 2023. JA8-26. On February 17, 2023, NMIC filed a motion to dismiss Kovachevich's amended claims under Federal Rule of Civil Procedure 12(b)(6). JA4. By order dated September 22, 2023, the district court granted NMIC's motion and dismissed Kovachevich's HPA claim with prejudice for failure to state a claim, while dismissing the remaining state-law counts for lack of subject matter jurisdiction. JA59-77. On October 11, 2023, Kovachevich timely appealed the district court's dismissal order. JA76. This Court has jurisdiction over Kovachevich's appeal pursuant to 28 U.S.C. § 1291, which provides for jurisdiction over appeals from all final orders of the district courts. *See LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 603 (5th Cir. 1976).

## STATEMENT OF THE ISSUES

1.     Whether 12 U.S.C. § 4902(f)(2) requires an insurer of private mortgage insurance to reimburse premiums for periods after cancellation or termination of

PMI under any of the provisions of the Homeowners Protection Act, or only for qualifying cancellation or termination events under § 4902(a)-(c).

2.  Whether voluntary cancellation of private mortgage insurance under 12 U.S.C. § 4910(b) triggers a mortgage insurer's obligation to reimburse unearned premiums pursuant to 12 U.S.C. § 4902(f)(2).

## STATEMENT OF THE CASE

### A.  History and Structure of the HPA

Kovachevich's claims arise from an all-too-common practice by mortgage insurance companies like NMIC to retain and collect premiums on PMI even after the need for such insurance has lapsed, including when, as here, all parties to the mortgage agree to cancellation.  As Congress recognized in passing the Homeowners Protection Act, these "unnecessary premiums—which in some cases amount to over $1,000 per year [in 1990s dollars]—benefitted no one, other than the PMI companies" who "raked-in risk-free money."  144 Cong. Rec. S8514-03.  PMI companies and the servicers who benefit from the insurance thus had "no vested interest in pursuing cancellation [of PMI], and the homeowner who was paying for the PMI could not, or did not know, that the coverage could be cancelled."  *Id.*

Faced with this "unethical" practice of "fleecing [] homeowners," in 1998, Congress passed the HPA to "put an end to forced payments by thousands of middle-class homeowners for unnecessary private mortgage insurance."  *Id.*  At the time of

the Act's passage, Congress estimated that "at least 250,000 homeowners" were paying unnecessary PMI premiums, at a cost of "$300 million yearly." 144 Cong. Rec. S8514-03. To address this unjust windfall to PMI companies, the HPA established standards for the disclosure and termination of PMI so that "borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary." H.R. Rep. No. 105-55, at 6 (1997).

Relevant here, under 12 U.S.C. § 4902, the HPA establishes several means for termination or cancellation of PMI, namely: (1) through a request from the borrower on "the cancellation date[1] or any later date," § 4902(a): (2) automatically upon the "termination date"[2] of the mortgage, § 4902(b); and (3) if neither subsection (a) or (b) are triggered, automatically after the "midpoint of the amortization period of the loan," § 4902(c). The HPA also preserves a mortgagor's right to cancel the PMI on his or her loan by agreement with a mortgagee at any time, stating:

> Nothing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the

---

[1] "Cancellation date" is defined as, "at the option of the mortgagor, the date on which the principal balance of the mortgage . . . based solely on the initial amortization schedule for the mortgage . . . is first scheduled to reach 80 percent of the original value of the property securing the loan; or based solely on actual payments, reaches 80 percent of the original value of the property securing the loan." 12 U.S.C. § 4901(2).

[2] "Termination date" is defined as "the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan." 12 U.S.C. § 4901(18).

mortgage, of a requirement for private mortgage insurance in connection with a residential mortgage transaction before the cancellation or termination date established by this chapter for the mortgage.

12 U.S.C. § 4910(b).

In keeping with Congress's intent in passing the HPA, the Act further prohibits mortgage insurers and servicers from retaining unearned PMI premiums in the event of cancellation or termination of the insurance. Specifically, 12 U.S.C. § 4902(f) contains two subsections setting forth the reimbursement obligations of servicers and insurers, respectively. First, § 4902(f)(1) provides that servicers must reimburse unearned premiums within 45 days of the termination or cancellation of PMI "under this section," referring to § 4902:

Not later than 45 days after the termination or cancellation of a private mortgage insurance requirement under this section, all unearned premiums for private mortgage insurance shall be returned to the mortgagor by the servicer.

By contrast, § 4902(f)(2)—titled "Transfer of funds to servicer"—requires mortgage insurers (such as NMIC here) to transfer unearned premiums to the relevant servicer within 30 days of "notification by the servicer of termination or cancellation of [PMI] *under this chapter*," referring to termination or cancellation of PMI under any provision the HPA:

Not later than 30 days after notification by the servicer of termination or cancellation of private mortgage insurance under this chapter with respect to a mortgagor, a mortgage insurer that is in possession of any unearned premiums of that mortgagor shall transfer to the servicer of

7

the subject mortgage an amount equal to the amount of the unearned premiums for repayment in accordance with paragraph (1).

Subsection (f)(2) thus provides a broader set of circumstances when insurers must reimburse unearned premiums, consistent with the HPA's goal of preventing an unfair windfall to those insurers. 144 Cong. Rec. S8514-03. Section 4902(f)(2) then directs that unearned premiums transferred by the insurer to the relevant servicer should be repaid by the servicer to the mortgagor "in accordance with [§ 4902(f)(1)]."

To effectuate these requirements, the HPA holds mortgage insurers liable to mortgagors for any violation of the HPA related to the mortgagor. 12 U.S.C. § 4907(a). Thus, a mortgagor may obtain actual and statutory damages for a mortgage insurer's violation of § 4902(f)(2). *Id.*

## B. Kovachevich's PMI Cancellation

NMIC's treatment of Kovachevich in this case provides a prime example of the unearned windfall that Congress intended to stamp out under the HPA. In July 2020, Appellant Steve Kovachevich obtained a mortgage from McClean Mortgage Corporation to purchase a home in Brambleton, Virginia. JA12. Because his down payment was less than 20 percent of the purchase price, McClean Mortgage required Kovachevich to obtain PMI as part of his financing. JA12. Rather than pay monthly PMI premiums, however, Kovachevich opted to prepay the PMI upfront for a total of $4,582.80, which McClean Mortgage forwarded to NMIC. JA12.

As part of his closing, Kovachevich received a "Private Mortgage Insurance Disclosure" stating that his PMI would terminate automatically on September 1, 2026. JA12. The Disclosure further advised that Kovachevich had the right to cancel his PMI before this date if certain requirements were met. JA12. Shortly after Kovachevich's closing date, on July 24, 2020, Freddie Mac purchased Kovachevich's loan, with LoanCare, LLC as servicer. JA12.

In April 2021, Plaintiff requested that LoanCare cancel his PMI after several home improvements and market conditions caused the value of his home to substantially increase (thereby increasing the ratio of his equity in the home to the principal balance of the mortgage). JA13. LoanCare denied this initial request based on the original value of Kovachevich's home, but it informed Kovachevich that he could cancel his PMI coverage based on the current value of his property if he obtained a "Broker Provided Opinion" and met other conditions. JA13. Kovachevich subsequently obtained a Broker Provided Opinion, at a cost of $105.00, and resubmitted his PMI cancellation request to LoanCare. JA13.

On June 23, 2021, LoanCare informed Kovachevich that his "'previously required mortgage insurance'" had "'been cancelled/terminated'" as of "'7/1/2021.'" JA13 (citation omitted). LoanCare explained that it cancelled the PMI in its capacity as representative of the mortgage holder, Freddie Mac, because

Kovachevich: (1) had a good payment history; (2) was current on the payment terms; and (3) satisfied all of Freddie Mac's requirements for cancellation. JA13.

Unbeknownst to Kovachevich, however, despite cancelling his PMI, LoanCare would not refund his prepaid PMI premiums for periods after the cancellation date because the PMI insurer on his loan, NMIC, considered the prepaid premium "non-refundable." JA13-14. Despite this claim, Kovachevich never signed any agreement or acknowledgement with NMIC that the prepaid premiums would be nonrefundable. JA14-15. In fact, he had no prior relationship with NMIC at all. JA12. Nor did NMIC or any other party disclose to Kovachevich that if he opted to prepay his premiums, such premiums would not be refunded for periods after the PMI was cancelled. JA14-15.

Indeed, NMIC's claim directly contradicted its own representations on its website. For example, NMIC states on its website that borrowers of Freddie Mac loans can cancel their PMI based on the current value of their loan. JA15. It also states that it "'will cancel the'" PMI "'upon receiving the servicer's notification'" of Freddie Mac's cancellation approval, and the website includes a "'Non-HPA Cancellation: Single Premium Refund Schedule,'" which establishes a pro-rata refund rate for prepaid premiums based on the number of months the PMI was in force. JA15.

Despite these representations and the requirements of the HPA, to date, NMIC has refused to refund the unearned premiums from Kovachevich's PMI.  JA16.

## C.    Procedural History

Kovachevich filed a Class Action Complaint against NMIC and LoanCare in November 2022.[3]  JA3.  NMIC moved to dismiss the original Complaint on January 13, 2023.  JA4.  Kovachevich then filed a First Amended Complaint on February 3, 2023, which NMIC again moved to dismiss.  JA4.

At issue in this appeal is the primary claim asserted against NMIC, alleging violations of the HPA.[4]  Kovachevich asserted that claim (Count One) on behalf of himself and the following class:

> All individuals who as: (1) mortgagors of loans insured by NMIC; (2) prepaid PMI premiums; (3) and cancelled that PMI before the prepaid premiums were fully earned; (4) but were not refunded unearned PMI premiums in full or in part; (5) during the two-year period before this Complaint was filed.

---

[3] Kovachevich dismissed his claims against LoanCare on May 23, 2023.  JA6.

[4] Kovachevich also asserted two state-law counts against NMIC—one for unjust enrichment (Count Two) and one for conversion (Count Three)—only in the alternative to Count One.  JA18-26.  After dismissing the only federal question claim in Count One, the district court declined to exercise diversity jurisdiction over these alternative claims under the Class Action Fairness Act.  JA71-74.  Kovachevich does not appeal the decision to dismiss the alternative claims here, though because the district court erred in dismissing Count One, the district court's basis for dismissing the alternative claims—the lack of diversity jurisdiction—would become a nullity, as there would now be a federal question claim to which the state-law claims (which are based on the same facts) relate.  28 U.S.C. § 1367(a).

JA16.  Kovachevich alleged that NMIC violated § 4902(f)(2) of the HPA by failing to return to Kovachevich and the class unearned PMI premiums for periods after the PMI had been cancelled, entitling Kovachevich and the class to actual and statutory damages under § 4907.  JA16-18.

### D.    The District Court's Opinion

On September 22, 2023, the district court issued an opinion and order granting NMIC's motion to dismiss and dismissing Kovachevich's HPA claim with prejudice.  JA59-75.

In dismissing Kovachevich's HPA claim, the district court first found that 12 U.S.C. § 4902(f)(2) requires an insurer to reimburse unearned premiums only in the event of a qualifying cancellation or termination of PMI under § 4902(a)-(c).  JA62-63.  The district court rejected Kovachevich's argument that, by its plain terms, § 4902(f)(2) requires repayment of unearned premiums for any cancellation or termination of PMI "under this chapter," which referred to the HPA as whole, including § 4910(b).  *See* JA69-70; *see also* 12 U.S.C. § 4910(b).  The court appeared to reason that even though subsection (f)(2) provides for reimbursement for any cancellation or termination "under this chapter," which is distinct from subsection (f)(1)'s requirement that servicers reimburse unearned premiums only for cancellations or terminations "under this section," NMIC was nonetheless not obligated to reimburse premiums for cancellation or termination outside of § 4902

because subsection (f)(2) requires "repayment" of unearned premiums "in accordance with paragraph (1) [i.e., subsection (f)(1)]." JA69-70.

The district court then found that Kovachevich had not terminated the PMI on his mortgage under § 4902(a), as alleged. JA63-66. The district court thus concluded that there was no qualifying cancellation event that triggered NMIC's reimbursement obligation under § 4902(f)(2) and dismissed Kovachevich's HPA claim with prejudice. JA74.

## SUMMARY OF ARGUMENT

I.     The district court erred in finding that 12 U.S.C. § 4902(f)(2) requires mortgage insurers to reimburse unearned PMI premiums only if the PMI is cancelled or terminated pursuant to the terms of § 4902(a)-(c). By its plain terms, § 4902(f)(2) requires insurers to transfer unearned premiums to the relevant servicer of the mortgage loan for repayment to the mortgagor within thirty (30) days of any termination or cancellation of PMI "under this chapter." This is distinct from a servicer's obligation to reimburse unearned premiums pursuant to § 4902(f)(1), which Congress intentionally limited to only cancellation or termination events "under this section." Congress's selection of different terms—"under this section" versus "under this chapter"—in sequential provisions of the Act, no less, confirms that insurers' reimbursement obligations are triggered by more than only cancellation or termination pursuant to § 4902.

13

II.     "Under this chapter," as used in § 4902(f)(2), instead refers to the entire HPA, obligating insurers like NMIC to reimburse unearned premiums for termination or cancellation of PMI pursuant to any provision of the Act.  The HPA consistently uses "chapter" to refer to the entire Act.  The HPA also distinguishes between obligations triggered by only a "section" of the Act and obligations triggered by the "chapter," or Act, as a whole, consistent with the usage of those terms in § 4902(f)(1)-(2).  The Supreme Court has found that "chapter" refers to an entire Act and is not "'readily susceptible [to] misinterpretation,'" or "a narrowing construction."  *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 332 (2014) (citations omitted).  "Chapter" thus plainly refers to the entire HPA.

III.     Under the HPA, a mortgagor and mortgage holder may voluntarily agree to cancel or terminate PMI at any time.  12 U.S.C. § 4910(b).  As alleged in the Amended Complaint, Kovachevich and the servicer of his mortgage, LoanCare (acting on behalf of the mortgage holder, Freddie Mac), at a minimum, agreed to cancel Kovachevich's PMI.   This agreement constituted a cancellation or termination of PMI "under this chapter" that triggered NMIC's obligation to reimburse the unearned premiums from Kovachevich's PMI pursuant to § 4902(f)(2).  Because § 4910(b) is the only other provision outside of § 4902 that provides for cancellation or termination of PMI, to give effect to "under this chapter" in § 4902(f)(2), voluntary cancellation under § 4910(b) must trigger an insurer's

14

reimbursement obligation. This reading is also consistent with the history and purpose of the HPA, which is a remedial statute and should thus be interpreted liberally to give effect to its purpose of preventing unfair windfalls to insurers. It also avoids the unjust result of the district court's interpretation, which leaves those like Kovachevich who prepay their PMI premiums and are able cancel the insurance before the cancellation or termination date on their loan without recourse under the Act.

IV.    The district court's reasons for limiting § 4902(f)(2) to only cancellation or termination under the terms of § 4902(a)-(c) were improper. The district court limited subsection (f)(2) to the same extent as subsection (f)(1), even though subsection (f)(2) intentionally adopts the broader "under this chapter" language. The court reasoned that because subsection (f)(2) states that the amount transferred by an insurer to a servicer is intended for "repayment in accordance with paragraph (1) [i.e., § 4902(f)(1)]," the subsection requires insurers to reimburse premiums to the same extent as subsection (f)(1), which is limited by the "under this section" language. Not only does this interpretation read "under this chapter" out of subsection (f)(2), it also ignores the rule of the last antecedent, which establishes that limiting phrases modify only the noun or phrase immediately prior to them. Applying this rule, the phrase "in accordance with paragraph (1)" in subsection (f)(2) modifies only the noun "repayment," confirming that the unearned premiums

transferred by an insurer to a servicer under subsection (f)(2) should in turn be repaid by the servicer to the mortgagor consistent with subsection (f)(1). The phrase does not limit or modify an insurer's obligation to reimburse unearned premiums for any cancellation or termination "under this chapter," including § 4910(b). The district court's dismissal of Kovachevich's HPA claim was thus in error and should be reversed and remanded.

## ARGUMENT

### A. Standard of Review

The Fourth Circuit "review[s] de novo the district court's grant of [a] motion to dismiss." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). In reviewing a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). "To survive the motion, a complaint . . . must contain sufficient facts to state a claim that is 'plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Issues of statutory interpretation are likewise reviewed de novo. *Broughman v. Carver*, 624 F.3d 670, 674 (4th Cir. 2010). The objective of statutory interpretation is "'to ascertain and implement the intent of Congress.'" *Id.* (quoting *Scott v. United States*, 328 F.3d 132, 138 (4th Cir. 2003)). Congressional intent is most apparent in the plain text of the statute, but that text should not be viewed as

"isolated words." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019). Rather, it is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (internal quotations and citations omitted). A statute's "'history and purpose' [also] divine the meaning of [statutory] language." *Id.* (citation omitted). Courts should be "guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purpose." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

**B.** **The District Court Erred in Interpreting § 4902(f)(2) as Requiring Reimbursement of Unearned Premiums Only for Qualifying Cancellation or Termination Events under § 4902.**

The district court erred in finding that § 4902(f)(2) requires repayment of unearned premiums only if the PMI is terminated or cancelled under § 4902(a)-(c). In reaching this conclusion, the district court ignored the plain terms of §§ 4902(f)(1) and 4902(f)(2), which distinguish between instances when a servicer and insurer must reimburse unearned premiums and provide a broader reimbursement obligation to insurers beyond the provisions of § 4902.

*1.* *Section 4902(f)(2) required NMIC to reimburse premiums for termination/cancellation under any provision of the HPA.*

Specifically, as noted above, § 4902(f) contains two subsections, each with its own requirements for reimbursement of unearned premiums. First, under subsection (f)(1), a mortgage servicer (such as LoanCare) is required to reimburse unearned

17

premiums to the mortgagor within 45 days of the termination or cancellation of PMI "under this section," referring to § 4902. Second, under subsection (f)(2), a mortgage insurer (such as NMIC) must transfer unearned premiums to the servicer for reimbursement to the mortgagor within 30 days after it receives notice "of termination or cancellation . . . *under this chapter*." (emphasis added). Congress thus elected to distinguish between instances when servicers must reimburse unearned premiums and instances when insurers must do so, with insurers bearing a broader obligation to reimburse whenever they receive notice of a termination or cancellation under the terms of the Act.

Indeed, as the district court acknowledged, a "'material variation in language [in a statute] suggests a material variation in meaning.'" JA69 (quoting *United States v. Jones*, 60 F.4th 230, 235 (4th Cir. 2023)). Thus, by electing to require servicers to reimburse mortgagors only when termination or cancellation occurs "under this section," while requiring reimbursement from mortgage insurers for termination or cancellation "under this chapter"—in two sequential provisions of the Act, no less—Congress intended for subsection (f)(2) to apply to a different set of termination/cancellation events than subsection (f)(1). *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (stating that "when 'Congress includes particular language in one section of a statute but omits it in another'—let alone the very next

provision—this Court 'presume[s]' that Congress intended a difference in meaning" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

The question then becomes which termination/cancellation events "under this chapter" refers to. To that end, this Court has instructed that terms should be given the same meaning "as consistently used elsewhere in the statute." *See Jones*, 60 F.4th at 235. Applying the same reasoning, the HPA consistently refers to the entire Act as a "chapter." *See* 12 U.S.C. § 4901 ("In this chapter, the following definitions shall apply[.]"); § 4903(a)(3) (requiring an annual disclosure of "the rights of the mortgagor under this chapter to cancellation or termination of the [PMI] requirement"); § 4903(b) (describing disclosure requirements for mortgages in existence "before the effective date of this chapter"); § 4906 (prohibiting the charging of fees to a mortgagor for the "provision of any notice . . . pursuant to this chapter"); § 4908 (providing that "the provisions of this chapter shall supersede" certain provisions of state law); § 4909 (providing for enforcement of the requirements "under this chapter" by federal agencies); § 4910 (stating that nothing "in this chapter" shall effect certain rights to avoid or terminate PMI). Like § 4902(f), the HPA also elsewhere distinguishes between requirements of a specific section versus requirements of the chapter (i.e., the Act) as a whole. *See id.* § 4903(d) (permitting use of standardized forms to make disclosures "under this section, which disclosure shall relate to the mortgagor's rights under this chapter");

*see also* § 4907 (providing civil liability for any violation of "a provision of this chapter," thus distinguishing between specific provisions and the Act as whole). And the Act similarly requires that notice be provided to the mortgagor for any termination or cancellation of PMI "in accordance with this chapter," regardless of which section of the Act is the trigger of the cancellation or termination. *See id.* § 4904(a).[5] To remove any doubt, the HPA itself falls under Chapter 49 of Title 12, confirming that "chapter" refers to the entire Act.

Other courts, including the Supreme Court, have also interpreted "chapter" to refer to the entire act in question. For example, in *Utility Air Regulatory Group v. EPA*, the Supreme Court found that the phrase "for each pollutant subject to regulation under this chapter" meant pollutants subject to regulation under "the entire Act." 573 U.S. 302, 331-332 (2014). The Court found that this phrase "'would not seem readily susceptible [of] misinterpretation,'" and that "a narrowing construction" was not appropriate given the broad reference to the entire act. *See id.* at 332 (alteration supplied) (citations omitted). Similarly, in *Harrison v. PPG Industries, Inc.*, the Court held that a provision making reviewable "any other final action of the Administrator under this chapter" referred to "actions [Congress] had

---

[5] Consistent with this provision, as alleged below, the PMI disclosure that Kovachevich received with his closing materials stated that he could cancel PMI by agreement if other conditions were met, further supporting that cancellation by agreement is a triggering event under the HPA. *See* JA12.

specifically directed or authorized the Administrator to take under sections of the Act not specifically enumerated under [the provision in question]." 446 U.S. 578, 607 (1980). In other words, the term "under this chapter" incorporates sections of the relevant statute outside of the specific section in which the term appears.

So too here. By its plain terms and consistent with its intentional usage elsewhere in the HPA, "under this chapter" in § 4902(f)(2) refers to cancellation or termination that occurs under any provision of the Act, including provisions other than § 4902. To hold otherwise would render the meaning of "chapter" in § 4902(f)(2) entirely different from its meaning elsewhere in the Act—a result this Court has explicitly rejected. *See Jones*, 60 F.4th at 235 (rejecting interpretation of "and" as disjunctive when it was used in the conjunctive everywhere else in the statute). It would also defy controlling precedent interpreting "chapter" as referring to an entire statute and not only the "section" in which the term is located.

### 2. Section 4902(f)(2) required NMIC to reimburse unearned premiums for voluntary cancellations under § 4910(b).

Because § 4902(f)(2) required NMIC to reimburse unearned premiums for cancellation or termination under any provision of the HPA, Kovachevich was not required to cancel or terminate his PMI under only § 4902 to qualify for reimbursement. The district court erred in holding otherwise. Indeed, other provisions of the HPA also permit cancellation or termination of PMI under the precise circumstances at issue here. Specifically, § 4910(b) provides that "nothing"

21

in the Act prevents a mortgagor and mortgage holder from cancelling or terminating PMI "by agreement" at any time prior to the cancellation or termination date. In other words, another provision in the same "chapter" as § 4902(f)(2) expressly permits voluntarily termination or cancellation of PMI, which then triggers an insurer's duty to reimburse unearned premiums under subsection (f)(2). At least four factors support this reading.

First, finding that voluntary cancellations or terminations under § 4910(b) constitute a cancellation or termination "under this chapter" gives effect to the plain terms of § 4910(b). That provision states that "[n]othing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the mortgage, of a requirement for private mortgage insurance . . . before the cancellation or termination date established by this chapter for the mortgage." 12 U.S.C. § 4910(b). By necessary implication, this language confirms that cancellation or termination by agreement is permitted under the Act and thus constitutes a qualifying cancellation or termination "under this chapter." Courts have interpreted similarly phrased provisions to the same effect. For example, in *Staron v. McDonald's Corp.*, the Second Circuit considered a provision in the Americans with Disabilities Act stating that "'[n]othing in this chapter shall be construed to preclude the prohibition of, or the imposition of restrictions on, smoking . . . in places of public accommodation covered by subchapter III of this

chapter.'" 51 F.3d 353, 357 (2d Cir. 1995) (quoting 42 U.S.C. § 12201(b)). The court found that the provision "expressly permits a total ban on smoking if a court finds it appropriate under the ADA." *Id.* Likewise, in *Bailey v. United States Department of Agriculture*, the Tenth Circuit held that a provision of the Right to Financial Privacy Act providing that "[n]othing in this chapter" prohibited banks from sharing information regarding suspected violations of the law expressly permitted banks to share such information under the terms of the act. 59 F.3d 141, 142-143 (10th Cir. 1995). When a provision provides that nothing in the relevant statute prohibits certain conduct, courts have thus interpreted the provision as expressly permitting that conduct under the terms of the statute. The same is true here: by stating that nothing in the Act precludes mortgagors and mortgage holders from agreeing to cancel or terminate PMI, the HPA expressly provides that such agreements constitute permissible cancellations or terminations "under this chapter."

Second, this reading further gives effect to the terms of § 4902(f)(2). Indeed, there is no other provision in the HPA outside of § 4902 that discusses alternative means of cancellation or termination. To give effect to the "under this chapter" term in § 4902(f)(2), therefore, voluntary termination or cancellation under § 4910(b) must also constitute a qualifying event that triggers an insurer's reimbursement obligation. Otherwise, Congress's choice of "under this section" in subsection (f)(1) and "under this chapter" in subsection (f)(2) is a distinction without a difference.

Such a result should be avoided. *See Loughrin*, 573 U.S. at 358 (refusing to override presumption that selection of different terms in different sections denotes different meanings when doing so "would render [the] second clause superfluous"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect . . . to every word Congress used.").

Third, by requiring reimbursement of unearned premiums for any cancellation or termination under the terms of the HPA, including voluntary cancellations under § 4910(b), the Court gives effect to the purposes of the Act. The "history and purpose" of a statute can "divine the meaning of language" in that statute. *Gundy*, 139 S. Ct. at 2126 (quotations and citations omitted). When the purpose of an act is remedial, courts should be "guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purpose." *Tcherepnin*, 389 U.S. at 336. Such statutes should thus be read "'to effect [their] remedial purposes.'" *Minor v Bostwick Lab'ies, Inc.*, 669 F.3d 428, 437 (4th Cir. 2012) (Fair Labor Standards Act).[6]

---

[6] This Court has applied this canon of statutory construction across a broad swath of remedial statutes, including consumer statutes like the HPA. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 576 (4th Cir. 1997) (Individuals with Disabilities Education Act); *Sidwell v. Express Container Servs., Inc.*, 71 F.3d 1134, 1140 (4th Cir. 1995) (Longshore and Harbor Workers' Compensation Act); *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 123 (4th Cir. 1991) (Employee Retirement Income Security Act); *Dorsey v. Bowen*, 828 F.2d 246, 248 (4th Cir. 1987) (Social Security Act); *Ryan v. Edwards*, 592 F.2d 756, 760 (4th Cir. 1979) (Motor Vehicle Information and Cost Savings Act).

The HPA is one such remedial statute and should be interpreted to effectuate its remedial purposes. *See Fried v. JPMorgan Chase & Co.*, No. 15-cv-2512, 2017 WL 5951585, at *6 n.2 (D.N.J. Nov. 30, 2017). To that end, Congress emphasized that the HPA is designed to address a specific problem: "forced payments by thousands of middle-class homeowners for unnecessary private mortgage insurance." 144 Cong. Rec. S8514-03. Fundamentally, Congress wanted to ensure that "borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary." H.R. Rep. No. 105-55, at 6 (1997); *see also* 144 Cong. Rec. H5428-02, 1998 WL 391227 (statement from Rep. Castle) (stating that "bottom line" for passage of the HPA is that "people continue to pay [PMI premiums] for years and years after they should have stopped"); *id.* (statement from Rep. Leach) ("This legislation is about saving money for America's homeowners by ensuring that they do not overpay for [PMI]."). This included preventing "an unjustified windfall to insurance companies, and an unfair burden on homeowners." *Id.* (statement of Rep. Laflace). Thus, a central purpose of the HPA is to prevent mortgage insurers and servicers from retaining unearned premiums as an "unjustified windfall" in the event of cancellation or termination.

As the district court itself recognized (JA71), its reading of § 4902(f)(2) undermines this purpose by allowing mortgage insurers to retain unearned premiums even though all parties agree that the PMI should be cancelled, simply because the

cancellation request does not, in the district court's view, meet the requirements of § 4902(a)-(c). This results in the "unjustified windfall" to insurers like NMIC that the HPA was designed to prevent.

On the other hand, reading "under this chapter" in § 4902(f)(2) as requiring reimbursement by mortgage insurers in the broadest possible set of cases, including voluntary cancellation under § 4910(b), prevents the unjustified windfall to insurers that Congress intended to stamp out. It also encourages the cancellation of PMI in more instances, as without requiring reimbursement under § 4902(f)(2) for voluntary cancellations under § 4910(b), there would be no incentive for cancellation of prepaid PMI even when, as here, the borrower's equity in the home increases and renders the PMI unnecessary.

Finally, by enforcing the plain terms of subsection (f)(2) to require reimbursement of unearned premiums even when PMI has been voluntarily cancelled avoids punishing borrowers like Kovachevich who prepay their PMI premiums. Under the district court's reading, such borrowers are out of luck as the insurers have no obligation to return the premiums already paid by the borrower unless they wait for the cancellation or termination date to arrive years in the future, while those who do not prepay premiums can, by agreement, cancel their PMI *at any time* and stop the payment of unearned premiums before the insurer obtains them. As a result, those who prepay their premiums have no incentive to cancel the PMI

on their loans, even when it becomes unnecessary, as the insurer gets an unjustified windfall either with or without the insurance. Courts should avoid reading statutes in a manner that creates an unequal and illogical result, but this is precisely the reading the district court adopted here. *See Bechtel Constr., Inc. v. United Broth'd of Carpenters*, 812 F.2d 1220, 1225 (9th Cir. 1987) ("Legislative enactments should never be construed as establishing statutory schemes that are illogical, unjust, or capricious." (citation omitted)).

Instead of considering these factors, the district court improperly refused to apply § 4910(b) after finding that the provision does not itself provide for a private right of action. JA69. But Kovachevich is not seeking to enforce a private agreement to cancel his PMI through § 4910(b); he is seeking to enforce the HPA's express requirement that NMIC reimburse unearned premiums for any cancellation of PMI "under this chapter." Section 4910, which is contained in the same "chapter" as § 4902(f)(2), provides for such cancellation. Upon cancellation or termination under this provision, therefore, § 4902(f)(2) requires insurers like NMIC to reimburse the unearned premiums to the servicer for payment to the mortgagor "in accordance with" subsection (f)(1).

Accordingly, because Kovachevich alleged that he and LoanCare (as representative of the mortgage holder, Freddie Mac) at least voluntarily agreed to cancel the PMI on his mortgage, NMIC was obligated to reimburse Kovachevich's

unearned premiums under § 4902(f)(2), regardless of whether his cancellation request qualified under § 4902(a), as the cancellation was under another provision of the same "chapter"—§ 4910(b). JA13. Kovachevich thus stated a plausible claim in Count One, and the district court erred in dismissing that claim.

### 3. The district court misread the "accordance with paragraph (1)" clause in § 4902(f)(2) as limiting insurers' reimbursement obligations to the same extent as servicers' obligations under § 4902(f)(1).

By contrast, the district court's basis for limiting § 4902(f)(2)'s reimbursement obligation to only qualifying cancellation or termination events under § 49029(a)-(c) ignores the plain language of the provision and established principles of statutory construction. Although acknowledging that material variations in terms indicate material differences in meaning, the district court found that § 4902(f)(2) nonetheless required reimbursement by insurers only in the event of termination/cancellation under § 4902 (i.e., "under this section") because subsection (f)(2) states that insurers should reimburse unearned premiums "for repayment [to the mortgagor] in accordance with paragraph (1)." JA69-70. The court reasoned that because subsection (f)(1) requires reimbursement by servicers to the mortgagor only for termination/cancellation under the terms of § 4902, subsection (f)(2) in turn only required reimbursement by insurers in the same set of circumstances because repayment to the mortgagor under (f)(2) must be "in accordance with paragraph (1)." *Id.*

However, the district court's reading of subsection (f)(2) renders "under this chapter" entirely superfluous and was thus improper. Indeed, if Congress intended for insurers to reimburse unearned premiums only for qualifying events under § 4902, it would and could have used the same "under this section" language that it used in subsection (f)(1) and elsewhere in the Act. It did not, which confirms Congress's intent that insurers should reimburse unearned premiums in a broader set of termination/cancellation events than those enumerated under § 4902. By limiting subsection (f)(2) to the same extent as subsection (f)(1), the district court effectively read "under this chapter" out of the provision—a result courts should avoid. *See Loughrin*, 573 U.S. at 358 (refusing to override presumption that selection of different terms in different sections denotes different meanings when doing so "would render [the] second clause superfluous").

Instead, the "in accordance with paragraph (1)" language, by its plain terms, merely explains the purpose of the funds transferred by an insurer to the servicer. *See* 12 U.S.C. § 4902(f)(1)-(2). That is, while a mortgage insurer must "transfer to the servicer of the subject mortgage an amount equal to the amount of the unearned premiums" upon notice of cancellation/termination "under this chapter," that transferred amount is intended "for repayment in accordance with paragraph (1)," which states that the servicer shall return unearned premiums to the mortgagor. *See id.* While the insurer makes a payment to the servicer, therefore, the servicer must

pass that amount to the mortgagor consistent with subsection (f)(1).  This reading

makes practical and remedial sense, as it requires the parties already in privity—the

servicer and its insurer—to transfer the necessary funds, while preventing either the

insurer or servicer from obtaining a windfall from the unearned premiums by

ensuring that the mortgagor ultimately receives them.

This reading also comports with the rule of the last antecedent, under which a

limiting phrase—"in accordance with paragraph (1)"—modifies only the noun

immediately prior to it—"repayment"—and does not modify the other requirements

of the provision—i.e., that insurers reimburse unearned premiums upon any

cancellation or termination of PMI "under this chapter."  *See Barnhart v. Thomas*,

540 U.S. 20, 26 (2003) (explaining that under the "rule of the last antecedent," "a

limiting clause or phrase . . . should ordinarily be read as modifying only the noun

or phrase that it immediately follows"); *DaVita Inc. v. Va. Mason Mem. Hosp.*, 981

F.3d 679, 690 n.3 (9th Cir. 2020) (finding that placement of "in accordance with"

immediately after the phrase "'provide for primary payment (or appropriate

reimbursement),'" in statute "strongly suggest[ed] that the 'in accordance with'

phrase modifies the payment requirement" under the rule of the last antecedent).  Put

simply, "repayment in accordance with paragraph (1)" means just that: the funds

transferred by the insurer to the servicer should be repaid to the mortgagor,

consistent with subsection (f)(1).  The district court therefore erred in relying on "in

accordance with paragraph (1)" to supersede the conditions under which subsection (f)(2), by its plain language, requires reimbursement by an insurer.

* * *

Ultimately, because the plain language of § 4902(f)(2), as well as the structure, history, and purpose of the HPA, confirm that NMIC is obligated to reimburse unearned premiums even for cancellations under other provisions of the Act, including § 4910(b), Kovachevich stated a plausible claim under the HPA regardless of whether his cancellation request met the requirements of § 4902(a). The district court's dismissal of Count One should thus be reversed and remanded.

## CONCLUSION

For the reasons set forth above, the district court's September 22, 2023 Order should be reversed and remanded.

## STATEMENT REGARDING ORAL ARGUMENT

Kovachevich requests oral argument on this appeal. From counsel's research, the issues raised in this appeal are matters of first impression in any court of appeals and concern important questions of law that will impact the ability of consumers to obtain relief under the Homeowners Protection Act.

Respectfully submitted,
**STEVE KOVACHEVICH**

By:/s/ *Kristi C. Kelly*

Kristi C. Kelly, VSB #72791
Matthew G. Rosendahl, VSB #93738
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Counsel for Appellant hereby certifies that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(b).  The brief contains 7,366 words (as calculated by the word processing system used to prepare this brief), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style font.

Dated:  January 19, 2024                    By:*/s/ Kristi C. Kelly*
                                            *Counsel for Appellant*