# United States Court of Appeals

### *for the*

# Fourth Circuit

STEVE KOVACHEVICH, on behalf of himself
and all similarly situated individuals,

*Plaintiff-Appellant,*

– v. –

NATIONAL MORTGAGE INSURANCE CORPORATION,

*Defendant-Appellee,*

– and –

LOANCARE, LLC,

*Defendant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## BRIEF OF DEFENDANT-APPELLEE

GREGORY T. CASAMENTO
LOCKE LORD LLP
200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600

JOSEPH N. FROEHLICH
JNF LAW P.C.
307 Hogans Valley Way
Cary, North Carolina 27513
(919) 234-0228

*Attorneys for Defendant-Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## <u>DISCLOSURE STATEMENT</u>

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-2071</u>    Caption: <u>Steve Kovachevich v. National Mortgage Insurance Corporation et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>National Mortgage Insurance Corporation</u>
(name of party/amicus)

who is <u>Appellee</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?
              __ YES    <u>X</u> NO

2.    Does party/amicus have any parent corporations?
              <u>X</u> YES    __ NO

    If yes, identify all parent corporations, including all generations of parent corporations: <u>NMI Holdings, Inc.</u>

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
              <u>X</u> YES    __ NO

    If yes, identify all such owners: <u>NMI Holdings, Inc.</u>

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

__ YES      X NO

If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)

__ YES      X NO

If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?

__ YES      X NO

If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?

__ YES      X NO

If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:    */s/ Gregory T. Casamento*          Dated: March 21, 2024
Counsel for: National Mortgage Insurance Corporation

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES..........................................................4

STATEMENT OF THE CASE................................................................4

    I.      The Essential Role of PMI in the Housing Market...............................4

    II.    The Homeowners Protection Act ..........................................................7

    III.   Facts of Kovachevich's Claim ............................................................15

    IV.   The District Court's Opinion Dismissing Kovachevich's Claim .......18

SUMMARY OF ARGUMENT ............................................................22

ARGUMENT .......................................................................................24

    I.      Standard of Review. ...........................................................................24

    II.    The District Court Properly Interpreted The Obligations Of The
           Mortgage Insurer Under HPA § 4902(f)(2). ......................................25

          A.    The only obligation of the mortgage insurer to return
                premium under the HPA is found in § 4902(f)(2). ..................25

          B.    Kovachevich ignores the wording of §§ 4902(f)(2) and
                4910 to attempt to create a "return due to agreement"
                obligation for a mortgage insurer.............................................27

          C.    Kovachevich's contrived interpretation of the HPA
                creates a bizarre result..............................................................30

          D.    Kovachevich's argument that the phrase in § 4902(f)(2)
                "in accordance with paragraph (1)" only modifies the
                word "repayment" is flawed. ....................................................32

CONCLUSION....................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aziz v. Alcolac, Inc.*,
   658 F.3d 388 (4th Cir. 2011) ................................................................25

*Barnhart v. Thomas*,
   540 U.S. 20 (2003) ....................................................................33, 34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................24

*Broughman v. Carver*,
   624 F.3d 670 (4th Cir. 2010) ................................................................25

*Campbell v. Hampton Rds. Bankshares, Inc.*,
   925 F.Supp.2d 800 (E.D. Va. 2013) ................................................35

*Crespo v. Holder*,
   631 F.3d 130 (4th Cir. 2011) ................................................22, 34

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ................................................................24

*Hermanson v. Ditech Fin., LLC*,
   No. 17-cv-1085, 2017 WL 5905554 (E.D. Wis. Nov. 20, 2017) ...........21, 29, 32

*Hibbs v. Winn*,
   542 U.S. 88 (2004) ................................................................34, 35

*Kungys v. United States*,
   485 U.S. 759 (1988) ................................................................35

*Philips v. Pitt Cnty. Mem'l Hosp.*,
   572 F.3d 176 (4th Cir. 2009) ................................................................24

*Tankersley v. Almand*,
   837 F.3d 390 (4th Cir. 2016) ................................................24, 25

*United States v. Hayes*,
   555 U.S. 415 (2009) ................................................................33

*United States v. Jones*,
  60 F.4th 230 (4th Cir. 2023) ................................28, 29, 32

*United States v. Pressley*,
  359 F.3d 347 (4th Cir. 2004) ...................................35

*United States v. Rippetoe*,
  178 F.2d 735 (4th Cir. 1949) ...............................29, 32

*Williams v. Taylor*,
  529 U.S. 362 (2000)...........................................33, 34

**Statutes and Rules**

12 U.S.C. § 4901(1)–(18) ...........................................10

12 U.S.C. § 4901(2)(A).................................................9

12 U.S.C. § 4901(10) ..................................................3

12 U.S.C. § 4901(11) ..................................................2

12 U.S.C. § 4901(12) ..................................................9

12 U.S.C. § 4901(18)(A)...............................................9

12 U.S.C. § 4902(a) ..............................................*passim*

12 U.S.C. § 4902(b) .................................10, 12, 13, 32

12 U.S.C. § 4902(c) ...............................................10, 28

12 U.S.C. § 4902(e) .................................................10

12 U.S.C. § 4902(f)................................................*passim*

12 U.S.C. § 4903(a) ..................................................32

12 U.S.C.§ 4903(a)(1)................................................16

12 U.S.C. § 4903(a)(3)...............................................12

12 U.S.C. § 4904 ..................................................24, 28

12 U.S.C. § 4904(a) .................................................30

v

12 U.S.C. § 4904(a)(1)....................................................................13

12 U.S.C. § 4904(a)(2)....................................................................13

12 U.S.C. § 4904(b) ........................................................................13

12 U.S.C. § 4905(a)(2)....................................................................13

12 U.S.C. § 4905(b) ........................................................................13

12 U.S.C. § 4906 .............................................................................13

12 U.S.C. § 4907 .............................................................................14

12 U.S.C. § 4908 .......................................................................14, 37

12 U.S.C. § 4908(a)(1)................................................................8, 14

12 U.S.C. § 4908(b) ..................................................................14, 37

12 U.S.C. § 4909(c) ........................................................................15

12 U.S.C. § 4910 .......................................................................*passim*

12 U.S.C. § 4910(a) ........................................................................15

12 U.S.C. § 4910(b) ...................................................................*passim*

Fed. R. Civ. P. 12(b)(6)............................................................19, 25

**Legislative Materials**

H.R. Rep. No. 105-55, 1997 WL 188469 (1997) ....................................3, 7

S. Rep. No. 105-129, 1997 WL 688537 (1997)..........................4, 6, 7, 8

**Other Authorities**

*About Us; Who We Are,* Fannie Mae,
    https://www.fanniemae.com/about-us/who-we-are (last visited
    Mar. 13, 2024)............................................................................5

*Homeowners Protection Act (HPA or PMI Cancellation Act) Examination Procedures*, Consumer Financial Protection Bureau (Oct. 1, 2012), https://www.consumerfinance.gov/compliance/supervision-examinations/homeowners-protection-act-hpa-or-pmi-cancellation-act-examination-procedures/...............................................................3

*Private MI: A Source of Strength & Resiliency in the Housing Finance System*, U.S. Mortgage Insurers (Nov. 2023), https://www.usmi.org/wp-content/uploads/2023/11/Private-MI-Resiliency-White-Paper-11.08.23.pdf ................................................6

*Private Mortgage Insurance By The Numbers*, U.S. Mortgage Insurers (Nov. 8, 2023), https://www.usmi.org/wp-content/uploads/2023/11/PMI-by-the-Numbers-11.08.2023.pdf ........................7

## INTRODUCTION

Almost 26 years after Congress passed the Homeowners Protection Act ("HPA") and established comprehensive, uniform statutory procedures for the cancellation and termination of private mortgage insurance ("PMI"), Appellant Steve Kovachevich ("Kovachevich") now asserts that he has discovered a new structure within the HPA that would fundamentally rewrite that law to require Appellee National Mortgage Insurance Corporation ("NMIC") to return PMI premium based on a cancellation that does not satisfy the HPA's clear definition and requirements for termination and cancellation of PMI. Kovachevich's position relies heavily on his view of the "purpose" of the HPA, while twisting or simply ignoring the clear language of the HPA. However, as the District Court properly found, "the statute's purpose cannot override its unambiguous text." JA71.

Contrary to Kovachevich's attempt to portray mortgage insurance as a "fleecing" of homebuyers and "risk free" money for mortgage insurers, mortgage insurance serves an important role in the housing market by facilitating homeownership, reducing risk for lenders, and allowing borrowers to secure better financing terms even with low down-payments. PMI protects the lender from the risk of default by the borrower and subsequent foreclosure on the property. The lender purchases PMI so that it can recover costs associated with the resale of a property in the event of a foreclosure. Without such protection, lenders might simply

decide that providing loans to borrowers who cannot make a substantial down-payment is just too risky, and might opt to not make those loans at all.

To improve transparency to homeowners and support the stability of the housing market, the HPA set up a very specific structure for when a borrower is legally entitled to receive a refund of unearned PMI premium. The HPA also recognized that the mortgage insurer has no contract or relationship with the mortgagor,[1] and therefore provides that – in specific circumstances – the mortgage insurer must transfer funds to the servicer, who is the party that has an obligation to return funds to the mortgagor. Accordingly, the HPA defines with specificity the exact circumstances under which a requirement for PMI must be cancelled at the mortgagor's request or automatically terminated. While Kovachevich concedes that his situation does not fit the definition for "cancellation date" or "termination date" under the HPA, he now offers a tortured interpretation of the statute to claim that there are new, nonsensical obligations for the mortgage insurer that no mortgagor has argued for, and no court has previously found, in the 26 years of the statute's history. Tellingly, while Kovachevich relies heavily on snippets from the statutory

---

[1] The HPA defines "mortgagor" as "the original borrower under a residential mortgage . . .." 12 U.S.C. § 4901(11). NMIC will refer to the individual who is borrowing funds to pay for a residential property as the "borrower" or "mortgagor." In this instance, Kovachevich is the borrower and mortgagor.

history of the HPA to convey his belief in the HPA's "purpose,"[2] he cannot offer an

iota of that history to bolster his argument that there is an entirely separate structure

within the HPA by which a mortgage insurer must return unearned premium if the

mortgage holder[3] decides to end its requirement for PMI outside of the requirements

of the HPA. Moreover, Kovachevich's reliance on one section of the HPA entitled

"Construction" to concoct a whole new mechanism of liability for a mortgage insurer

---

[2]     While Kovachevich claims that the purpose of the HPA is to "put an end to"
the "unethical practice of fleecing homeowners" (Appellant's Br. at 5), the HPA's
purpose is much more nuanced than that. The Consumer Financial Protection Bureau
explains it as follows:

> The [HPA] addresses homeowners' difficulties in
> canceling private mortgage insurance (PMI) coverage. It
> establishes provisions for canceling and terminating PMI,
> sets disclosure and notification requirements, and requires
> the return of unearned premiums.

*Homeowners Protection Act (HPA or PMI Cancellation Act) Examination
Procedures*, Consumer Financial Protection Bureau (Oct. 1, 2012),
https://www.consumerfinance.gov/compliance/supervision-
examinations/homeowners-protection-act-hpa-or-pmi-cancellation-act-
examination-procedures/.

The House Report for the HPA specifically stated: "The purpose of this
legislation is to establish Federal guidelines for disclosure and termination of private
mortgage insurance (PMI)." H.R. Rep. No. 105-55, 1997 WL 188469, at *4 (1997).

[3]     The HPA defines the "mortgagee" as "the holder of a residential mortgage at
the time at which that mortgage transaction is consummated." 12 U.S.C. § 4901(10).
In most instances that is the same entity that has lent the money to the borrower, but
may also be a subsequent holder of the mortgage loan. NMIC will herein refer to
this entity as the "lender" or "mortgage holder." In this instance McLean Mortgage,
and later Freddie Mac, are the lender and mortgage holder, as applicable.

simply does not work and falls flat when one considers the plain text of the HPA, as opposed to the excerpts that Kovachevich offers as the basis for his argument. The District Court properly identified the holes in Kovachevich's position and its Memorandum Opinion and Order dated September 22, 2023 (the "Opinion") should be affirmed.

## STATEMENT OF THE ISSUES

1.  Did the District Court err in holding that a mortgage insurer was not obligated to return PMI premium when the mortgagor did not meet the requirements for a return of premium as outlined in § 4902 of the HPA?

2.  Did the District Court err in holding that § 4910 of the HPA was a "savings clause" that did not create an independent obligation for the mortgage insurer to return unearned premium for PMI when the well-defined structure and definition of cancellation and termination were not fulfilled?

## STATEMENT OF THE CASE

### I.     The Essential Role of PMI in the Housing Market

Simply put, PMI expands the opportunity for home ownership for millions of Americans, especially low to moderate income earners and first-time home purchasers. S. Rep. No. 105-129, 1997 WL 688537, at *2–3 (1997). Traditional underwriting principles for mortgage lenders would dictate that a borrower put down 20% of the home's purchase price to qualify for a mortgage loan. *Id.* This is intended

to create a "stake in the venture" as a homeowner that puts down 20% of their own money on a house is much less likely to default and simply walk away from the home. *Id.* However, such a requirement prevents many Americans from purchasing a home – especially first-time home buyers. *Id.*

To provide affordable liquidity to the American housing system through guarantees of mortgages, Congress created the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") as government sponsored enterprises ("GSEs") to support the conventional mortgage market. The creation of the GSEs was meant to provide and encourage competition in the housing finance system for the benefit of the American borrower, providing consumer choice, encouraging innovation, and driving down costs. The GSEs guarantee and purchase loans from lenders that fit their requirements, enabling these lenders to free up money so they can make more affordable mortgage loans, therefore ensuring the ongoing availability of such mortgage loans to the American public. *See About Us; Who We Are,* Fannie Mae, https://www.fanniemae.com/about-us/who-we-are (last visited Mar. 13, 2024). As part of their congressionally mandated charter, one of their requirements is that any loan guaranteed by the GSEs with a loan to value ratio greater than 80% requires credit enhancement. The most common and available form of credit enhancement in

the conventional mortgage market is PMI, which mitigates the risk of loss to both the GSEs and lenders, thereby increasing the availability of such loans.

PMI is insurance that protects the mortgage holder from mortgage default risk. S. Rep. No. 105-129, 1997 WL 688537, at *2–3 (1997). It encourages the original lender to make high ratio loans they might not otherwise be able to (i.e., when the borrower makes a down payment of less than 20%) by providing the mortgage holder with protection in the event of a default by the borrower. *Id.* In addition, it also enables the original lender to sell more of the loans that they originate to the GSEs, which in turn enables them to fund additional new mortgage loans because they now have more available capital. PMI allows the mortgage holder to recover the costs associated with having to proceed with a foreclosure sale as well as accrued interest payments and fixed costs prior to resale of the property, such as taxes and hazard insurance policies.[4] *Id.* PMI is a contract between the mortgage holder and the mortgage insurer and is solely for the benefit and protection of the mortgage holder: The defaulting borrower receives no benefit and recovers no funds from the PMI policy. *Id.* As a condition for providing the loan, many originators (and

---

[4]      While Kovachevich wants this Court to believe that mortgage insurance is a "risk free" venture, since the GSEs went into conservatorship at the beginning of the Great Financial Crisis in 2008, the PMI industry has paid nearly $60 billion in claims on defaulted loans that would have otherwise been absorbed by the lender and the GSEs. *See Private MI: A Source of Strength & Resiliency in the Housing Finance System*, U.S. Mortgage Insurers (Nov. 2023), https://www.usmi.org/wp-content/uploads/2023/11/Private-MI-Resiliency-White-Paper-11.08.23.pdf.

successor mortgage holders) require the borrower to pay them an amount equal to the cost of the PMI premiums, either as part of upfront closing costs or on an ongoing basis. By having the PMI as protection for originators (and successor mortgage holders) on loans that are riskier, lenders can make loans to individuals who cannot afford a down payment of 20%.[5]

## II.     The Homeowners Protection Act

In the late 1990's Congress became concerned that "homeowners are not always informed when PMI is required, and if it is, how it can be terminated." H.R. Rep. No. 105-55, 1997 WL 188469, at *6 (1997). While several states had passed laws regarding PMI, there were no uniform nationwide requirements for when PMI could be terminated and there were no requirements for informing borrowers about their rights relative to PMI. There were concerns that some mortgage holders were

---

[5]     In 1997, the year the HPA was passed, it was noted that: "Since 1994, PMI 'has saved home buyers $38 billion on down payments [and over] the past 40 years private mortgage insurance has enabled 17 million American households to become homeowners.'" H.R. Rep. No. 105-55, 1997 WL 188469, at *5–6 (1997).  Since 1957, PMI has helped more than 38 million homeowners who were unable to make a 20% down-payment. *Private Mortgage Insurance By The Numbers*, U.S. Mortgage Insurers (Nov. 8, 2023), https://www.usmi.org/wp-content/uploads/2023/11/PMI-by-the-Numbers-11.08.2023.pdf. Additionally, PMI has reached incremental borrowers from underserved communities to provide access to mortgage financing.  On average, nearly 35% of borrowers that need mortgage insurance have annual incomes below $75,000 and nearly 63% of purchasers are first-time homebuyers. *Id.*

requiring PMI for the entire life of the loan. S. Rep. No. 105-129, 1997 WL 688537, at *3 (1997).

The HPA, 12 U.S.C. §§ 4901 *et seq*., sets forth a comprehensive structure of requirements and restrictions for the placement and removal of PMI on residential mortgages.[6] The HPA specifically differentiates when the requirement for PMI must be cancelled at the borrower's request versus when the requirement for PMI must be automatically terminated. The HPA is structured as follows:

1.    Section 4901 – Definitions

This section provides eighteen (18) important definitions for the HPA, including "cancellation date" and "termination date." The "cancellation date" is defined under the HPA as:

> the date on which the principal balance of the mortgage–
> (i) based solely on the initial amortization schedule for the mortgage . . . is first scheduled to reach 80 percent of the original value of the property securing the loan; or (ii) based solely on actual payments, reaches 80 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(2). "Termination date" is defined as "the date on which the principal balance of the mortgage, based solely on the initial amortization schedule

---

[6]    The comprehensive nature of the HPA is reflected in the fact that Congress specifically provided that the HPA preempted state law "relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions, cancellation or automatic termination of such private mortgage insurance, any disclosure of information addressed to this chapter, and any other matter specifically addressed by this chapter." 12 U.S.C. § 4908(a)(1).

for the mortgage . . . is first scheduled to reach 78 percent of the original value of the property securing the loan." 12 U.S.C. § 4901(18). Another important definition in the HPA is "original value," which is defined as "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated." 12 U.S.C. § 4901(12). While this section includes definitions for other terms such as "mortgage insurance," "mortgage insurer," "mortgagee," "mortgagor," "private mortgage insurance," "residential mortgage," and "servicer," there is no definition for the term "current value" that was central to Kovachevich's argument to the District Court, nor that are now central to Kovachevich's current argument: "agreement" or "agreement between a mortgagor and the holder of the mortgage." *See generally* 12 U.S.C. § 4901(1)–(18).

2.    Section 4902 – Termination of private mortgage insurance

This section provides the conditions by which a "requirement for private mortgage insurance"[7] can be cancelled by the mortgagor or automatically

---

[7]    It is important to note that while Kovachevich's brief claims that he has a right to "cancel his PMI" (Appellant's Br. at 9, 21, 27–28), the HPA actually recognizes that it is the "requirement for private mortgage insurance," which is imposed by the mortgage holder, that is actually cancelled or terminated. *See, e.g.,* 12 U.S.C. § 4902(a) ("A *requirement* for private mortgage insurance . . . shall be canceled . . .") (emphasis added); 12 U.S.C. § 4902(b) ("A *requirement* for private mortgage insurance . . . shall terminate . . .") (emphasis added); 12 U.S.C. § 4902(c) ("If a *requirement* for private mortgage insurance is not otherwise canceled or terminated . . ., in no case may such a requirement be imposed . . . .") (emphasis added); 12

terminated. It also sets up a structure for the "Return of Unearned Premiums" to ensure that unearned premiums are timely returned to the borrower by the servicer upon a qualifying § 4902 cancellation or termination, and that the mortgage insurer likewise timely returns any related amounts of unearned premium that it may be holding to the servicer (not to the borrower as Kovachevich seems to argue) to enable the servicer's required repayment to the borrower. Section 4902(f) of the HPA states:

> (1) In General: Not later than 45 days after the termination or cancellation of a private mortgage insurance requirement under this section, all unearned premiums for private mortgage insurance shall be returned to the mortgagor by the servicer.

> (2) Transfer of Funds to Servicer: Not later than 30 days after notification by the servicer of termination or cancellation of private mortgage insurance under this chapter with respect to a mortgagor, a mortgage insurer that is in possession of any unearned premiums of that mortgagor shall transfer to the servicer of the subject mortgage an amount equal to the amount of the unearned

---

U.S.C. § 4902(e) ("No payments . . . may be required from the mortgagor in connection with a private mortgage insurance *requirement* . . ..") (emphasis added); 12 U.S.C. § 4910(b) ("Nothing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the mortgage, of a *requirement* for private mortgage insurance . . ..") (emphasis added). The HPA speaks in terms of ending the "requirement" for PMI (and not ending the PMI itself as Kovachevich suggests) because the actual PMI is not a contract between the mortgagor and the mortgage insurer. The "requirement" for PMI is solely the requirement of and for the benefit of the mortgage holder. The mortgage insurer, like NMIC, has no role in "requiring" a borrower to pay for the PMI on their mortgage loan. The mortgage insurer issues the PMI to the mortgage holder upon receipt of the premiums: It is the mortgage holder that requires the mortgagor to reimburse it for the PMI premiums.

premiums for repayment in accordance with paragraph (1).

12 U.S.C. § 4902(f). The 30-day timeframe for the mortgage insurer to transfer funds to the servicer under § 4902(f)(2) begins upon "*notification* by the servicer of termination or cancellation of private mortgage insurance *under this chapter*." *Id.* (emphasis added). As will be shown, the servicer's notification obligations are located in a different section of the HPA (namely, § 4904), hence the reference to notification "under this chapter" in § 4902(f)(2).

    3.    Section 4903 – Disclosure requirements

This section provides that at the time of closing the lender must provide certain disclosures related to PMI, including an initial amortization schedule and written notices that: (1) the borrower may cancel the requirement for PMI pursuant to § 4902(a), including the date on which the mortgagor may request cancellation based solely on the initial amortization schedule; (2) the borrower may request cancellation in accordance with § 4902(a) based on actual payments; (3) the requirement for PMI will automatically terminate on the termination date pursuant to § 4902(b) and what that termination date is; and (4) there are exceptions to the right to cancel or automatic termination for "high risk" loans, and whether such an exception applies. This section also requires the servicer to make annual disclosures of the borrower's rights to cancellation or termination of the PMI requirement and contact information to determine whether the PMI requirement can be canceled. *See*

12 U.S.C. § 4903(a)(3). Interestingly, Congress imposed no requirement for any disclosure that relates to a permissive cancellation contemplated under the savings clause of § 4910, Kovachevich's claimed "agreement" section of the HPA.

### 4. Section 4904 – Notification upon cancellation or termination

This section of the HPA governs notification of the cancellation or termination of a PMI requirement. It states that the servicer must provide written notice "[n]ot later than 30 days after the date of cancellation or termination of a [PMI] requirement" that the PMI is terminated (12 U.S.C. § 4904(a)(1)) and that no further PMI payments will be due or payable from the borrower (12 U.S.C. § 4904(a)(2)). This "notification by the servicer of termination or cancellation of private mortgage insurance" in § 4904(a)(1) triggers the mortgage insurer's obligations in § 4902(f)(2).

If the servicer determines that the mortgage did not meet the requirements for certain cancellation or termination of PMI, i.e., specifically those under § 4902(a) or § 4902(b), then the servicer must provide written notice of the grounds for such a denial. *See* 12 U.S.C. § 4904(b).

### 5. Section 4905 – Disclosure requirements for lender paid mortgage insurance

This section of the HPA provides for separate disclosure requirements for lender paid mortgage insurance, i.e., when payments for mortgage insurance are not

required by the lender to be made by the borrower. *See* § 4905(a)(2). Lender paid mortgage insurance is excluded from the cancellation and termination provisions of § 4902, the disclosure provisions of § 4903, and the notification provisions of § 4904. *See* 12 U.S.C. § 4905(b).

6. Section 4906 – Fees for disclosures

This section provides that that the fees for notices required by the HPA cannot be passed on to the borrower. *See* 12 U.S.C. § 4906.

7. Section 4907 – Civil Liability

This section provides the mechanism by which a borrower can bring a claim against the servicer, lender or mortgage insurer for alleged violations of the HPA, sets the limit for class action damages, and sets a 2-year statute of limitations for claims under the HPA. *See* 12 U.S.C. § 4907.

8. Section 4908 – Effect on other laws and agreements

This section provides that the HPA supersedes state law relating to PMI, including its cancellation, termination, and the required disclosures. *See* 12 U.S.C. § 4908(a)(1). This section also provides that the HPA "shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto)." 12 U.S.C. § 4908(b).

9.     Section 9 - Enforcement

This section of the HPA provides for enforcement of the HPA by several governmental agencies. In the section entitled "Enforcement and Reimbursement," it empowers the agency to give notice to mortgage holders and servicers of failures to comply with the HPA, require the mortgage holder and servicer to correct the borrower's account and require the mortgage holder or servicer to reimburse the borrower for unearned premiums paid after the date on which the obligation to pay ceased. *See* 12 U.S.C. § 4909(c). Notably, there is no mention of the mortgage insurer in this enforcement section. This contradicts Kovachevich's position that the reimbursement obligations of the mortgage insurer are broader than those of the servicer. *See* Appellant's Br. at 8.

10.     Section 4910 – Construction

While this is the provision that Kovachevich claims creates a whole new obligation for the mortgage insurer in the event of an "agreement" between the lender/servicer and the borrower, the title of the section is simply "Construction." This section of the HPA first states that the HPA cannot be construed to impose any requirement for PMI. 12 U.S.C. § 4910(a). There is also a sub-section entitled "No Preclusion of Cancellation or Termination Agreements," which states:

> Nothing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the mortgage, of a requirement for private mortgage insurance in connection

14

> with a residential mortgage transaction before the
> cancellation or termination date established by this chapter
> for the mortgage.

12 U.S.C. § 4910(b). Other than stating that agreements between the borrower and the lender to cancel the "requirement" for PMI are not precluded, this section specifies nothing further about such agreements. This sub-section provides no mechanism for the return of PMI premium in the event of such an agreement and makes no reference back to the provisions of the HPA that do provide for the return of unearned premium, and as previously shown, is not referenced in the Notification or Disclosure sections discussed above.

## III. Facts of Kovachevich's Claim

On or about July 17, 2020, Kovachevich borrowed $577,432.00 from McLean Mortgage Corporation ("McLean Mortgage") to purchase a residential property for $636,500.00 in Brambleton, Virginia. JA12 ¶ 13. Since Kovachevich's down payment on the property was less than 20% of the purchase price, McLean Mortgage required PMI on Kovachevich's mortgage loan. JA12 ¶ 14. McLean Mortgage purchased a non-refundable PMI policy from NMIC to protect itself (and its successor mortgage holders) from a potential default by Kovachevich.[8] JA55.

---

[8] While Kovachevich takes issue with the idea that McLean Mortgage did not tell him it was purchasing a non-refundable policy (Appellant's Br. at 10), Kovachevich's ire is misplaced. Again, the PMI policy is a contract between NMIC and McLean Mortgage. Any disclosure to Kovachevich related to the PMI that McLean Mortgage decided to purchase was McLean Mortgage's responsibility. *See*

Although Kovachevich's mortgage loan with McLean Mortgage included the financed amount of $4,582.80 to fully cover McLean Mortgage's purchase of the non-refundable PMI policy from NMIC, Kovachevich himself admits that he had no contract with NMIC. JA12 ¶¶ 15–16. Instead, the PMI policy was solely a contract between NMIC and McLean Mortgage (and its successor mortgage holders). JA55. As part of the closing documents, Kovachevich received a "Private Mortgage Insurance Disclosure" from McLean Mortgage which stated that the PMI for his loan would automatically terminate on September 1, 2026, when the loan-to-original-value ("LTOV") ratio on Kovachevich's loan was first scheduled to reach 78%. JA12 ¶ 17.

On July 24, 2020, Freddie Mac purchased Kovachevich's loan, and LoanCare, LLC ("LoanCare") continued to service the mortgage loan. JA4 ¶ 7. In April 2021, Kovachevich requested that LoanCare cancel the PMI on his mortgage loan. JA13 ¶ 19. LoanCare denied this request due to the fact that Kovachevich's LTOV ratio was not 80% or less based on the then-current unpaid principal balance (i.e., as is required in connection with a borrower-requested cancellation pursuant to the HPA). JA13 ¶ 20. However, LoanCare, on its own volition, informed Kovachevich that he could

_____

12 U.S.C.§ 4903(a)(1) ("[T]he mortgagee shall provide the mortgagor [the disclosures]"). The mortgage insurer has no role in providing such disclosures. In this case, McLean Mortgage opted to purchase a cheaper non-refundable policy (just like purchasing a cheaper non-refundable airline ticket), as opposed to a more expensive refundable policy.

alternatively seek to cancel the PMI coverage on his mortgage loan based on the current value of his property (i.e., based on a concept not contemplated by the HPA and thus not cancelled pursuant to it) if certain conditions were met. JA13 ¶ 21. Kovachevich then obtained a Broker Provided Opinion to demonstrate that his loan-to-current-value ("LTCV") ratio was at 80% or less and then resubmitted his request to LoanCare to cancel PMI on that alternative basis. JA13 ¶ 23; JA39–42. On June 23, 2021, LoanCare informed Kovachevich by letter that the PMI for his loan would be cancelled as of July 1, 2021. JA13 ¶ 24. LoanCare, on behalf of Freddie Mac in its capacity as owner of the loan, offered to cancel its requirement for PMI if Kovachevich "(1) had a good payment history; (2) was current on the payment terms of the mortgage; and (3) satisfied all requirements of Freddie Mac for cancellation." JA13 ¶ 25; JA29–30 ¶¶ 10–12. Kovachevich then sought to obtain a refund of premium on the non-refundable PMI.[9] JA13–14 ¶¶ 26–29. Kovachevich alleged that

---

[9]     As NMIC has explained, the PMI policy that McLean Mortgage obtained to protect itself in the event of a default by Kovachevich clearly indicates "No Refund" in the "Refund Type" category. *See* JA55. In an effort to manipulate the information displayed on NMIC's website, Kovachevich selectively included a screenshot of a refund schedule applicable only to *refundable* PMI premiums. JA15 ¶ 37. While NMIC's website *does* indicate that PMI premiums are refundable in certain instances – namely, cancellations made pursuant to the HPA, or cancellations of contractually *refundable* PMI premiums, Kovachevich's cancellation was *not* made pursuant to the HPA. Kovachevich cannot import terms from NMIC's website that are not applicable to the operative PMI policy purchased by McLean Mortgage.

at the time he filed the complaint he had not received a return of any of the PMI premium for his loan from LoanCare. JA16 ¶ 40.

## IV. The District Court's Opinion Dismissing Kovachevich's Claim

On September 22, 2023 the District Court dismissed Kovachevich's HPA claim with prejudice because he failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[10] JA59, 74. The Honorable Jamar K. Walker concluded that "it is evident from the facts pleaded in the complaint and from the plain language of the statute that the HPA – in this case – does not afford plaintiff relief." JA71.

Judge Walker began his analysis by noting that the HPA mandates the return of premium "under certain circumstances" because Kovachevich had argued, in essence, that he was entitled to a refund based largely on the "purpose" of the HPA. JA62. Judge Walker then noted that the important provisions for Kovachevich's claim for the return of PMI premium were §§ 4902(f)(1) and 4902(f)(2), rather than the savings clause in § 4910. JA62. Judge Walker first pointed out that § 4902(f)(1) governs the return of unearned premium from the servicer to the mortgagor "not later than 45 days after the termination or cancellation of a [PMI] requirement under [§4902]" JA62. Judge Walker then pointed out the distinction between §§ 4902(f)(1)

---

[10]     The District Court also dismissed Kovachevich's state law claims for conversion and unjust enrichment without prejudice for lack of subject matter jurisdiction. JA59, 74. The District Court granted Kovachevich an opportunity to file an amended complaint to attempt to cure the jurisdictional defect (JA75), but Kovachevich waived that right and instead filed this appeal (JA76).

and 4902(f)(2) and noted that § 4902(f)(2) requires the mortgage insurer to transfer funds equal to any unearned premium to the servicer "for repayment in accordance with [§ 4902(f)(1)]" within 30 days after "notification by the servicer of termination or cancellation of [PMI] under this chapter." JA63.

Judge Walker then determined that Kovachevich was not entitled to a return of unearned premium under § 4902(f)(1). JA63. Judge Walker analyzed whether Kovachevich had cancelled pursuant to the borrower cancellation provision under § 4902(a) and concluded that he had not because he "never alleges that the balance of his loan reached 80% or less of the original value of the property." JA64. Instead, Kovachevich had plead that the balance of his loan was below 80% "of the *current* value of the property." JA64 (emphasis in original). Judge Walker pointed out that nowhere in the HPA does it discuss current value, so Kovachevich "has not stated a plausible claim that he cancelled pursuant to the cancellation date." JA64.

Judge Walker then turned to Kovachevich's argument that the term "any later date" in § 4902(a) means that Kovachevich did not have to meet the requirement of achieving an 80% LTOV and only had to meet the four (4) other requirements within § 4902(a), i.e., a written request, good payment history, current on his payments and evidence that the property had not declined in value. Judge Walker pointed out that Kovachevich's interpretation of "any later date" would produce an absurd result: "[A] mortgagor could be entitled to an HPA-mandated cancellation of their PMI

immediately upon closing on their mortgage."[11] JA66. Such an absurd result would permit a borrower to immediately cancel their PMI, leave the mortgage holder completely exposed, and prevent the loan from being eligible for sale to a GSE because that loan would not fit within the GSE's purchasing guidelines.

Judge Walker then analyzed whether Kovachevich had a claim under HPA § 4902(f)(2). Judge Walker specifically pointed out that Kovachevich's position ignored a key provision of § 4902(f)(2), namely that any payment by the mortgage insurer to the servicer would be "an amount equal to the amount of unearned premium for repayment *in accordance with [4902(f)(1)]*." JA68 (quoting 12 U.S.C. § 4902(f)(2) (emphasis in original)). Judge Walker aptly pointed out:

> The plain language of § 4902(f)(2) ties a mortgagor's entitlement to unearned premiums to what they are owed under § 4902(f)(1). For the reasons stated in Part II.A.i, the plaintiff has no claim under § 4902(f)(1). Thus, "the amount equal to the amount of unearned premiums for repayment in accordance with § 4902(f)(1)" is zero because the plaintiff's cancellation did not occur under § 4902(a-c). Therefore, NMIC's withholding of the plaintiff's prepaid premiums does not violate § 4902(f)(2).

JA68.

---

[11]    While the "on any later date" position was Kovachevich's primary argument in his opposition to NMIC's motion to dismiss, it appears that Kovachevich has abandoned this argument because he does not assert it in the current appeal. The fact that Kovachevich has now abandoned his primary argument to the District Court is telling.

Finally, Judge Walker rejected Kovachevich's ancillary arguments that § 4910(b) provides some sort of additional structure for the return of unearned premium by a mortgage insurer in the event of an "agreement" and that the distinction between "under this section" and "under this chapter" in §§ 4902(f)(1) and 4902(f)(2) entitle Kovachevich to a return of unearned premium. First, Judge Walker pointed out that while § 4910(b) does state that mortgage holders and mortgagors may enter into outside agreements to cancel the requirement for PMI, "unlike § 4902, it does not state that the mortgagor is statutorily entitled to any unearned premiums [from the mortgage insurer]." JA68. Judge Walker recognized that other courts have held that § 4910(b) is merely a savings clause and does not create a separate cause of action to obtain unearned premium. JA69 (citing *Hermanson v. Ditech Fin., LLC*, No. 17-cv-1085, 2017 WL 5905554 (E.D. Wis. Nov. 20, 2017)). Next, Judge Walker recognized the different language in §§4902(f)(1) and 4902(f)(2), and correctly noted that Congress could have used "under this chapter" in § 4902(f)(1) if it was intending to create a right for a mortgagor to obtain unearned premium from the servicer other than pursuant to the specific requirements of § 4902. JA69–70. Again, if there is no right for a mortgagor to receive funds from the servicer under § 4902(f)(1), then there is no requirement for a mortgage insurer to transfer funds to the servicer under § 4902(f)(2).

In concluding, Judge Walker, relying on this Court's precedent in *Crespo v. Holder*, 631 F.3d 130, 136 (4th Cir. 2011), noted that the purpose of the statute cannot override the unambiguous text of the statute. JA70. Despite Kovachevich's efforts to create ambiguity, the District Court properly concluded that the HPA "does not afford [Kovachevich] relief." JA71.

## SUMMARY OF ARGUMENT

The District Court correctly dismissed Count I of the First Amended Complaint with prejudice.

I. The plain text of § 4902(f)(2) demonstrates that Congress did not intend to require the return of PMI premiums in any instance other than cancellation or termination done pursuant to § 4902, and the District Court properly arrived at the same conclusion. Because LoanCare has no obligation to return premium to Kovachevich pursuant to § 4902(f)(1), there is no obligation under the HPA for NMIC to return funds to LoanCare, and the District Court's Opinion should be affirmed.

II. Kovachevich's reading of § 4902(f)(2) that he wishes would create an obligation for NMIC to return premiums based on the words "under this chapter" is misguided. First, the logical interpretation of "under this chapter" in § 4902(f)(2) is that it was intended to refer to the notification procedures in § 4904 (the only notification requirements contained in "this chapter"), not that it was intended to

create expansive additional obligations for mortgage insurers like NMIC. Second, as the District Court aptly noted, all § 4910 does is allow the mortgagee (i.e., the lender, and in this case LoanCare as servicer) to independently agree to end its PMI requirement with the mortgagor (i.e., the borrower, and in this case, Kovachevich); it does not "entitle the mortgagor to any unearned premiums under the HPA." JA69.

III. Kovachevich's contrived interpretation of the HPA – that there is a broader obligation for the mortgage insurer to return premiums to the lender/servicer in § 4902(f)(2) than there is for the servicer to return premiums to the mortgagor/borrower in § 4902(f)(1) – taken in conjunction with the facts of this case, creates a bizarre result with no close-ended recovery to Kovachevich at all. Under Kovachevich's reading, the lender/servicer would be able to claw back and retain premiums even though the lender/servicer purchased a non-refundable policy like the one at issue in this case. The HPA was intended to create uniform requirements for disclosure and termination of PMI; it clearly was not intended to provide a windfall for the lender/servicer.

IV. Kovachevich's last-ditch effort to rely on the rule of the last antecedent, which was not previously raised in its briefing in the District Court, is unavailing. First, he fails to consider that the rule applies to modification of a noun or *phrase*. Second, if the Court were to adopt Kovachevich's theory, the language "in accordance with paragraph (1)" becomes completely superfluous, as one could

simply eliminate that phrase to achieve a general concept of repayment. Third, if it was the intent of Congress to force the repayment of premium to the servicer any time it reached an agreement with the borrower regardless of compliance with the rest of the statutory requirements, then Congress would have drafted § 4902(f)(1) to say "in accordance with this chapter" or "in accordance with § 4910(b)."

Kovachevich's arguments are inconsistent with the plain language of the statute and the applicable statutory interpretation rules, and would create absurd results. Accordingly, the District Court properly dismissed Count I of the First Amended Complaint with prejudice and this Court should affirm that decision.

## **ARGUMENT**

### I.     **Standard of Review.**

The Fourth Circuit reviews de novo a district court's granting of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 179–80 (4th Cir. 2009). While the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the complaint must contain sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court "may affirm on any grounds supported by the record, notwithstanding the reasoning of the district court." *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016).

The Fourth Circuit also reviews de novo questions of statutory interpretation. *See Broughman v. Carver*, 624 F.3d 670, 674 (4th Cir. 2010). When interpreting a statute, the Court's "objective . . . is 'to ascertain and implement the intent of Congress,' and Congress's intent 'can most easily be seen in the text of the Acts it promulgates.'" *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 392 (4th Cir. 2011) (quoting *Broughman*, 624 F.3d at 674–75).

The District Court's Opinion was well-reasoned, faithful to the record, and supported by legal authority that clearly refuted the "absurd result" propounded by Kovachevich. As such, the District Court properly granted NMIC's motion to dismiss and for these reasons, in addition to the reasons set forth below, the Opinion should be affirmed.

## II. The District Court Properly Interpreted The Obligations Of The Mortgage Insurer Under HPA § 4902(f)(2).

### A. The only obligation of the mortgage insurer to return premium under the HPA is found in § 4902(f)(2).

The HPA clearly identifies the only time an insurer is required to refund PMI premium, i.e., after a "notification by the servicer of termination or cancellation of private mortgage insurance under this chapter" *See* 12 U.S.C. § 4902(f)(2). Kovachevich acknowledges this in his appellate brief. *See* Appellant's Br. at 14, 18. It then follows that if NMIC has any obligation to return any premium to the servicer (i.e., LoanCare), it must come from this section of the HPA, as there is no other

provision of the HPA that mandates that a mortgage insurer transfer funds to another party. As the District Court correctly explained, Kovachevich fails to consider all of the language in § 4902(f)(2), specifically the portion that indicates "a mortgage insurer . . . shall transfer to the servicer of the subject mortgage an amount equal to the amount of the unearned premiums for repayment *in accordance with paragraph (1)*." JA68 (emphasis in original). The plain text of § 4902(f)(2) demonstrates that Congress did not intend to require the return of PMI premium in any other instance, and the District Court properly arrived at the same conclusion. The District Court reasoned that "[t]he plain language of § 4902(f)(2) ties a mortgagor's entitlement to unearned premium to what they are owed under § 4902(f)(1)," and as a result, properly held that NMIC did not violate § 4902(f)(2) because Kovachevich's cancellation did not occur under § 4902(a–c). JA68; *see also* JA70 ("Congress expressly tied a mortgagor's entitlement to unearned premiums to the date of cancellation or termination.") (citing 12 U.S.C. § 4902(f)). Therefore, because LoanCare had no obligation to return premium to the borrower pursuant to § 4902(f)(1), there is no obligation under the HPA for NMIC to return funds to the lender/servicer, and the District Court's Opinion should be affirmed. *See* JA68 ("Thus, 'the amount equal to the amount of unearned premiums for repayment in accordance with § 4902(f)(1)' is zero because the plaintiff's cancellation did not occur under § 4902(a-c)").

**B.** **Kovachevich ignores the wording of §§ 4902(f)(2) and 4910 to attempt to create a "return due to agreement" obligation for a mortgage insurer.**

Kovachevich's argument that the use of the phrase "under this chapter" in § 4902(f)(2) creates a broader obligation for the mortgage insurer to return premiums is misguided. Appellant's Br. at 7–8, 17–22. Section 4902(f)(2), entitled "Termination of private mortgage insurance," states:

> Not later than *30 days after notification* by the *servicer* of termination or cancellation of private mortgage insurance *under this chapter* with respect to a mortgagor, a *mortgage insurer* that is in possession of any unearned premiums of that mortgagor shall transfer to the servicer of the subject mortgage *an amount equal to the amount of the unearned premiums for repayment in accordance with paragraph (1)*.

12 U.S.C. § 4902(f) (emphasis added). Kovachevich's argument that the use of "under this chapter" means that a mortgage insurer "bear[s] a broader obligation to reimburse" (Appellant's Br. at 18) twists the actual words of § 4902(f)(2). Kovachevich focuses on the words 'termination or cancellation" of the PMI, and he claims "under this chapter" applies solely to "termination or cancellation." He actually ignores the prior words in the sentence, which trigger the mortgage insurer's obligation: "*notification* by the servicer of termination or cancellation of private mortgage insurance *under this chapter*." *See id.* (emphasis added). Importantly, the only notification provision under the HPA regarding cancellation or termination is not included in § 4902, but rather, is located in § 4904, entitled "Notification upon

cancellation or termination." 12 U.S.C. § 4904.[12] Therefore, the logical interpretation of the use of "under this chapter" in § 4902(f)(2) was that it was necessary because Congress was referring to the notification procedures in § 4904 (i.e., a different section than § 4902), and not that it was intended to create broader refund obligations for the mortgage insurer than those of the servicer.[13] *See United States v. Jones*, 60 F.4th 230, 238 (4th Cir. 2023) (quoting *United States v. Rippetoe*, 178 F.2d 735, 737 (4th Cir. 1949)) ("statutes 'are to be given a sensible construction'—interpretations that would lead to absurd consequences 'should be

---

[12]    The notification provision of the HPA indicates that

> [n]ot later than 30 days after the date of cancellation or termination of a private mortgage insurance requirement in accordance with this chapter, the servicer shall notify the mortgagor in writing—(1) that the private mortgage insurance has terminated and that the mortgagor no longer has private mortgage insurance; and (2) that no further premiums, payments, or other fees shall be due or payable by the mortgagor in connection with the private mortgage insurance.

12 U.S.C. § 4904(a).

[13]    It is simply not logical that Congress intended to create a "broader" obligation for mortgage insurers to give money back to the servicer than the servicer's obligation to give money to the borrower. There is no indication that the HPA was designed to give servicers a broader right to recover funds than the individual homeowners. If the mortgage insurer's obligation were broader than the servicer's, then you would get the absurd result that a servicer would be able to demand money from the mortgage insurer that it has no obligation to pay to the borrower. *See infra,* Section II, C.

avoided whenever a reasonable application can be given consistent with the legislative purpose.'").

Additionally, Kovachevich's argument that Section 4910(b), which permits an agreement between the mortgagor and the lender, somehow entitles Kovachevich to a refund of unearned premium is a tortured interpretation of the statute. Section 4910(b), entitled "Construction," indicates that "[n]othing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the mortgage, of a *requirement* for private mortgage insurance . . .." 12 U.S.C. § 4910(b) (emphasis added). This section has been classified as a "savings clause" that "allows for mortgage companies and parties to enter into outside agreements to determine when PMI will be terminated or cancelled, but it does not create a separate cause of action. . . . [T]here is no federal claim under the Savings Clause of the HPA." *Hermanson v. Ditech Fin., LLC*, 2017 WL 5905554, at *3. As the District Court aptly noted, all this section does is allow the mortgagee (i.e., the lender) to agree to end its PMI requirement with the mortgagor (i.e., the borrower); it does not "entitle the mortgagor to any unearned premiums under the HPA."[14] JA2969. Kovachevich is impermissibly attempting to

---

[14] It makes sense that the "savings clause" does not mention the mortgage insurer because the mortgage insurer has no contract with the borrower and only a contract with the lender that purchased the mortgage insurance policy for its own protection. While the lender/servicer is certainly free to enter into whatever agreement it wants to with the borrower (and thus could certainly agree to pay any money it received

expand the scope of the HPA to impose on the mortgage insurer obligations that the statute does not authorize.[15] Tellingly, in the 26-year history of the statute, no court has found that the HPA provides a statutory framework for the return of premium when the borrower and lender end the "requirement" of PMI by agreement. Therefore, the District Court Opinion should be affirmed.

## C.    Kovachevich's contrived interpretation of the HPA creates a bizarre result.

Kovachevich claims that there is a broader obligation for the mortgage insurer to return premiums to the servicer in § 4902(f)(2) than there is for the servicer to return premiums to the borrower in § 4902(f)(1). *See* Appellant's Br. at 8, 28–31.

---

from the borrower back to the borrower), the lender/servicer cannot use its agreement with the borrower to obtain a better mortgage insurance policy than the one it actually purchased. In this case, Kovachevich's position is that by agreeing to cancel the requirement for PMI, LoanCare is somehow entitled to get the benefit of a refundable PMI policy that its predecessor, McLean Mortgage, opted not to purchase.

[15]     The fallacy of Kovachevich's position that there are other provisions of the HPA that require reimbursement is further evident in a review of the disclosure provisions outlined in § 4903. Notably, § 4903 requires the lender to disclose to the borrower in writing at closing the ways in which the borrower can achieve cancellation of PMI under § 4902(a) and that PMI will automatically terminate on the termination date under § 4902(b), subject to certain exceptions that are not applicable to this case. *See* 12 U.S.C. § 4903(a). Absent from these disclosures is a reference to cancellation under any other circumstances, i.e., by agreement under § 4910. If Congress wanted to offer the borrower another mechanism to cancel PMI and receive reimbursement, such as under § 4910 like Kovachevich suggests, Congress would have included a requirement for disclosure of the same in § 4903. The fact that Congress did not require any disclosures pursuant to § 4910 is notable.

However, Kovachevich's contrived interpretation of the HPA in conjunction with the facts of this case creates a bizarre result, with LoanCare having no obligation to give the funds to Kovachevich that it receives from NMIC. As an initial matter, under the HPA, the mortgage insurer's obligation is to return any unearned premiums to the servicer, not to the borrower. *See* 12 U.S.C. § 4902(f)(2) ("Not later than 30 days after notification by the servicer of termination or cancellation of private mortgage insurance under this chapter . . ., a *mortgage insurer* that is in possession of any unearned premiums of that mortgagor shall transfer to the *servicer* of the subject mortgage an amount equal to the amount of the unearned premiums for repayment in accordance with paragraph (1).") (emphasis added). Based on Kovachevich's own concession that he is not entitled to a return of premium under § 4902(f)(1), NMIC would have an obligation to return the premium to LoanCare under § 4902(f)(2), but LoanCare would have no obligation to return that premium to Kovachevich under § 4902(f)(1). Curiously, under Kovachevich's theory, he would be left with no statutory private right of action to enforce the agreement he alleges he has with LoanCare under § 4910 – constituting yet another absurd result that Congress surely did not intend. *See Hermanson*, 2017 WL 5905554, at *3 ("[T]here is no federal claim under the Savings Clause of the HPA."). The HPA was not designed to create this result; namely, to provide a windfall for the lender/servicer, who would be able to claw back and retain premiums even though

the lender/servicer purchased a non-refundable policy like the one at issue in this case. *See Jones*, 60 F.4th at 238 (quoting *Rippetoe*, 178 F.2d at 737).[16]

### D. Kovachevich's argument that the phrase in § 4902(f)(2) "in accordance with paragraph (1)" only modifies the word "repayment" is flawed.

Recognizing that the District Court's finding that the "in accordance with paragraph (1)" language of § 4902(f)(2) ties it to the rights under § 4902(f)(1) was damning for his appeal, Kovachevich creates a flawed argument that the phrase "in accordance with paragraph (1)" only modifies the word "repayment". *See* Appellant's Br. 15, 28–31. The District Court held that Kovachevich's attempt to create a payment obligation under auspices of an agreement:

> [s]pecifically, . . . ignores that mortgage insurers 'shall transfer to the servicer of the subject mortgage an amount equal to the amount of the unearned premiums for repayment *in accordance with [4902(f)(1)]*.' 12 U.S.C. § 4902(f)(2) (emphasis added). The plain language of § 4902(f)(2) ties a mortgagor's entitlement to unearned premiums to what they are owed under § 4902(f)(1). For the reasons stated in Part II.A.i, the plaintiff has no claim under § 4902(f)(1).

---

[16]    The operative policy in this case is between McLean Mortgage (and its successor LoanCare) and NMIC, not Kovachevich and NMIC. McLean Mortgage received the coverage from NMIC that it paid for. It was McLean Mortgage that decided to buy a cheaper non-refundable policy for its protection (and that of its successor LoanCare). It would go against logic to permit LoanCare to retroactively receive the benefit of a more expensive refundable policy that McLean Mortgage did not select, even though such a refundable option was available at the time that McLean Mortgage obtained PMI from NMIC.

JA68 (emphasis in original). Kovachevich argues that the reference to § 4902(f)(1) in § 4902(f)(2) is only meant to modify the word "repayment" and is evidence of a general obligation of the servicer to repay. Kovachevich's last-ditch effort to rely on the rule of the last antecedent, which was not previously raised in its briefing in the District Court, is unavailing. *See United States v. Hayes*, 555 U.S. 415, 425 (2009) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("The rule of the last antecedent . . . 'is not an absolute and can assuredly be overcome by other indicia of meaning.'"); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (explaining that a "cardinal principle" of statutory construction is that "courts must give effect, if possible, to every clause and word of a statute . . . .")(citations omitted).[17]

First, if the Court were to adopt Kovachevich's theory, the language "in accordance with paragraph (1)" becomes completely superfluous, as one could simply eliminate that phrase to achieve the same general concept of repayment that Kovachevich claims is the purpose of "in accordance with paragraph (1)." Alternatively, if it was the intent of Congress to force the mortgage insurer to repay

---

[17]    While Kovachevich attempts to import the rule of the last antecedent to explain that "in accordance with 4902(f)(1)" modifies the *word* "repayment," he fails to consider that the rule also states that "a limiting clause or phrase . . . should ordinarily be read as modifying only the *noun or phrase* that it immediately follows." *See Barnhart*, 540 U.S. at 26 (emphasis added). A more plausible interpretation of the rule of the last antecedent in this context would be that it applies to the preceding phrase ("an amount equal to the amount of the unearned premiums for repayment") and not only the preceding noun ("repayment").

premium to the servicer whenever the servicer/lender reached an agreement with the borrower, then Congress would have drafted § 4902(f)(1) to say "in accordance with this chapter" or "in accordance with section 4910(b)." *See Crespo v. Holder*, 631 F.3d 130, 136 (4th Cir. 2011) ("[the Supreme Court] ha[s] stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'") (internal quotations and citation omitted). However, Congress did not draft the statute in this way, and contrary to Kovachevich's interpretation, the rule of the last antecedent can apply the language "in accordance with § 4902(f)(1)" to modify the *phrase* "an amount equal to the amount of the unearned premiums for repayment," without rendering any part of the section superfluous. *See Williams*, 529 U.S. at 404; *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative, or superfluous, void or insignificant.") (citation omitted); *see also Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion) (discussing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant."); *Campbell v. Hampton Rds. Bankshares, Inc.*, 925 F.Supp.2d 800, 808 (E.D. Va. 2013) (citing *United States v. Pressley*, 359 F.3d 347, 350 (4th Cir. 2004) ("[T]he Court must give meaning to every word of the statute, not reading any word out or treating it as surplusage.").

The fact that Kovachevich claims he had an agreement with LoanCare does not invent liability for NMIC, especially when such liability contradicts the HPA. Section 4908 of the HPA entitled "Effect on other laws and agreements" states that the HPA "shall supersede any conflicting provision of any agreement . . . entered into by the . . . Federal Home Loan Mortgage Corporation [i.e. Freddie Mac]." 12 U.S.C. § 4908(b). Kovachevich is impermissibly claiming that his agreement with LoanCare (who was acting on behalf of Freddie Mac) to cancel PMI based on the LTCV supersedes the provisions of § 4902 regarding reimbursement of premiums that apply to mortgage insurers. With the inclusion of § 4908, Congress intended just the opposite result. *See id.* The HPA only requires borrower-requested cancellation of PMI when the LTOV is at or below 80%, which did not occur here. JA64. Kovachevich cannot manipulate the statute to impose liability on NMIC because insofar as his agreement with LoanCare conflicts with the explicit requirements of the HPA (which it does), any such provisions are superseded by the HPA. *See* § 12 U.S.C. § 4908(b).

*   *   *   *   *

Despite the fact that no court has ever considered, let alone interpreted the HPA as Kovachevich suggests, Kovachevich attempts to have this Court chase the white rabbit to create a whole new system of liability for mortgage insurers that does not exist in the HPA. The use of "under this chapter" in § 4902(f)(2) was not

designed to create an absurd "broader" obligation for mortgage insurers, but rather, was simply a reflection of the fact that the notification requirements are in a different section of the HPA. The section of the HPA entitled "Construction," which included a savings clause for agreements between the lender and borrower, did not create some sort of parallel universe for the mortgage insurer to provide reimbursement to the servicer. If Congress intended to create a structure that required reimbursement by the mortgage insurer just because other parties agreed to end the "requirement" for PMI, it would have explicitly done so. It would have included some definitions that helped explain this, would have mandated disclosures about such agreements and would not have included a provision that said agreements that contradict the HPA are superseded. The District Court properly analyzed the text of the HPA without running down the rabbit hole, and thus, should be affirmed.

## CONCLUSION

For the foregoing reasons, NMIC respectfully requests that the Court affirm the District Court's Opinion.

Respectfully submitted,

**LOCKE LORD LLP**

*/s/ Gregory T. Casamento*
Gregory T. Casamento
Brookfield Place
200 Vesey St., 20th Flr.
New York, New York 10281-2101
(212) 812-8325
gcasamento@lockelord.com

Joseph N. Froehlich
JNF LAW P.C.
307 Hogans Valley Way
Cary, North Carolina
(919) 234-0228
joe@jnflawpc.com

*Attorneys for Defendant-Appellee*
*National Mortgage Insurance Corporation*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Counsel for Defendant-Appellee National Mortgage Insurance Corporation hereby certifies that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 9,306 words (as calculated by the word processing system used to prepare this brief), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style font.

Dated:      March 21, 2024

By:   *Gregory T. Casamento*
      *Counsel for Defendant-Appellee*
      *National Mortgage Insurance Corporation*